# **EXHIBIT G**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.*,[1] | Case No. 17-12560 (KJC) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: October 24, 2018, at 10:00 a.m. (ET)** |
| | **Ref. Docket No. 2397** |

## DEBTORS' MEMORANDUM OF LAW
## (I) IN SUPPORT OF CONFIRMATION OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF WOODBRIDGE GROUP OF COMPANIES, LLC AND ITS AFFILIATED DEBTORS; AND (II) IN RESPONSE TO FILED CONFIRMATION OBJECTIONS

---

[1]    The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3603. The mailing address for Woodbridge Group of Companies, LLC is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423.  Due to the large number of debtors in these cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein.  A complete list of this information may be obtained on the website of the Debtors' noticing and claims agent at www.gardencitygroup.com/cases/WGC, or by contacting the undersigned counsel for the Debtors.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

FACTS ..................................................................................................................................5

THE PLAN MEETS THE REQUIREMENTS FOR CONFIRMATION UNDER
SECTION 1129 OF THE BANKRUPTCY CODE.........................................................5

I.     Section 1129(a)(1): The Plan Complies with the Applicable Provisions of
the Bankruptcy Code.................................................................................................6

    A.     The Plan Satisfies the Classification Requirements of Section 1122
of the Bankruptcy Code ...............................................................................6

    B.     The Plan Complies with Section 1123(a) of the Bankruptcy Code.............8

         (a)     Section 1123(a)(1): Designation of Classes of Claims and
Equity Interests ...............................................................................8

         (b)     Section 1123(a)(2): Classes that Are Not Impaired by the
Plan .................................................................................................9

         (c)     Section 1123(a)(3): Treatment of Classes that Are Impaired
by the Plan.......................................................................................9

         (d)     Section 1123(a)(4): Equal Treatment Within Each Class................9

         (e)     Section 1123(a)(5): Adequate Means for Implementation ...........10

         (f)     Section 1123(a)(6): Prohibitions on Issuance of Non-
Voting Securities...........................................................................10

         (g)     Section 1123(a)(7): Provisions Regarding Directors and
Officers .........................................................................................11

         (h)     Section 1123(a)(8): Provisions Regarding Treatment of
Earnings and Future Income .........................................................12

    C.     The Plan Complies with Section 1123(b) of the Bankruptcy Code...........12

         (a)     Impairment/Unimpairment of Claims and Equity Interests...........12

         (b)     Assumption/Rejection of Executory Contracts and Leases...........12

         (c)     Cure Amounts ................................................................................13

(d)     Compromises and Settlements Under and in Connection with the Plan ...............................................................14

        (i)     Compromises and Settlements ............................................14

        (ii)     Causes of Action ...............................................................14

(e)     Releases, Exculpations, and Limitations of Liability ...................15

(f)     Other Appropriate Provisions Not Inconsistent with the Applicable Provisions of the Bankruptcy Code............................17

        (i)     Retention of Jurisdiction ....................................................17

        (ii)     Ponzi Scheme Findings......................................................18

II.     Section 1129(a)(2): The Plan Proponents Have Complied with the Applicable Provisions of the Bankruptcy Code.......................................23

III.     Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law ...........................................................24

IV.     Section 1129(a)(4): The Plan Provides that Professional Fees and Expenses Are Subject to Bankruptcy Court Approval ...........................24

V.     Section 1129(a)(5): The Plan Proponents Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders ......................25

VI.     Section 1129(a)(6): The Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission..........26

VII.     Section 1129(a)(7): The Plan Is in the Best Interest of Creditors.........................26

VIII.     Section 1129(a)(8): The Plan Complies with Section 1129(a)(8) of the Bankruptcy Code, with the Exception of Classes 6, 7, and 8 ...............................29

IX.     Section 1129(a)(9): The Plan Provides for Payment in Full of All Allowed Administrative Claims, Professional Fee Claims, Priority Tax Claims, and Priority Claims .....................................................................................30

X.     Section 1129(a)(10): At Least One Class of Impaired Claims Has Accepted the Plan ..................................................................................32

XI.     Section 1129(a)(11): Feasibility ..........................................................33

XII.     Section 1129(a)(12): All Statutory Fees Have Been or Will Be Paid...................34

XIII.     Sections 1129(a)(13) Through 1129(a)(16) Do Not Apply to the Plan ................34

XIV.   The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code ................................................................................35

    A.   The Plan Does Not Discriminate Unfairly ................................................35

    B.   The Plan Is Fair and Equitable ................................................................37

XV.   The Plan Satisfies the Requirements of Section 1129(c), (d), and (e) of the Bankruptcy Code ................................................................................39

XVI.   Responses to the Sarachek Group Objection ..........................................................39

    A.   The "Secured Creditor" Litigation Theory ................................................41

    B.   Was There a Ponzi Scheme? ................................................................43

    C.   The Propriety of Substantive Consolidation ..............................................46

    D.   Settlement of Hotly Contested Intercompany Liens ...................................48

    E.   Section 1129(a)(10) Issues ................................................................49

    F.   Treatment of Noteholders Relative to Unitholders ...................................50

CONCLUSION ................................................................................................53

# TABLE OF AUTHORITIES

Page(s)

CASES

*In re Abeinsa Holding, Inc.*,
  562 B.R. 265 (Bankr. D. Del. 2016) ..................................................8, 16, 47, 48

*In re Armstrong World Indus., Inc.*,
  348 B.R. 136 (Bankr. D. Del. 2006) .......................................................................7

*In re Armstrong World Indus., Inc.*,
  432 F.3d 507 (3d Cir. 2005).................................................................................36

*Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*,
  189 F.3d 321 (3d Cir. 1999)................................................................................18

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)....................................................................................26, 37

*In re Barney & Carey Co.*,
  170 B.R. 17 (Bankr. D. Mass. 1994) ..................................................................36

*In re Bryant*,
  439 B.R. 724 (Bankr. E.D. Ark. 2010) ...............................................................38

*In re Buttonwood Partners, Ltd.*,
  111 B.R. 57 (Bankr. S.D.N.Y. 1990)...................................................................36

*In re Charterhouse, Inc.*,
  84 B.R. 147 (Bankr. D. Minn. 1988) ..................................................................40

*In re Chateaugay Corp.*,
  177 B.R. 176 (S.D.N.Y. 1995)...............................................................................7

*Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*,
  280 F.3d 648 (6th Cir. 2002) ................................................................................7

*In re Coastal Broad. Sys.*,
  570 Fed. App'x 188 (3d Cir. 2014)........................................................................7

*In re Coram Healthcare Corp.*,
  315 B.R. 321 (Bankr. D. Del. 2004) ......................................................................7

*In re Deep River Warehouse, Inc.*,
  No. 04-52749, 2005 WL 2319201 (Bankr. M.D.N.C. Sept. 22, 2005)....................7

*Delp v. HBF Fin., Ltd. (In re Delp)*,
    2001 Bankr. LEXIS 2235 (Bankr. N.D. Tex. Sept. 27, 2001) ................................40

*In re Delta Air Lines, Inc.*,
    370 B.R. 537 (Bankr. S.D.N.Y. 2007) ....................................................................40

*In re Dura Auto. Sys., Inc.*,
    379 B.R. 257 (Bankr. D. Del. 2007) ......................................................................35

*In re Enron Corp.*,
    2006 Bankr. LEXIS 4294 (Bankr. S.D.N.Y. Jan. 17, 2006) ...................................41

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) ........................................................................48

*In re Griffiths*,
    27 B.R. 873 (Bankr. D. Kan. 1983) ......................................................................38

*Gruen Mktg. Corp. v. Asia Commercial Co. (In re Jewelcor Inc.)*,
    150 B.R. 580 (Bankr. M.D. Pa. 1992) ..................................................................17

*In re Hedged-Investments Assocs., Inc.*,
    48 F.3d 470 (10th Cir. 1995) ..........................................................................18, 19

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) ................................................................15, 17

*In re Jersey City Medical Center*,
    817 F.2d 1055 (3d Cir. 1987) ............................................................................6, 7

*John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993) ..................................................................................7

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part*, *rev'd in part on other
    grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, *In re Johns-Manville Corp.*, 843
    F.2d 636 (2d Cir. 1988) ......................................................................................36

*Johnson v. RFF Family P'ship, LP (In re Johnson)*,
    554 B.R. 448 (Bankr. S.D. Ohio 2016), *aff'd*, 2017 Bankr. LEXIS 1480
    (B.A.P. 6th Cir. June 2, 2017) ............................................................................42

*In re Johnson*,
    2016 Bankr. LEXIS 4598 (S.D. Ohio Nov. 10, 2016) .......................................41, 42

*Lenders Prot. Grp. v. USA Commer. Mortg. Co. (In re USA Commer. Mortg.
    Co.)*,
    2007 U.S. Dist. LEXIS 65264 (D. Nev. Aug. 29, 2007) .......................................40

*In re Lernout & Hauspie Speech Prods., N.V.*,
 301 B.R. 651 (D. Del. 2003) .................................................................35, 36

*Lisanti Foods, Inc. v. Lubetkin (In re Lisanti Foods, Inc.)*,
 329 B.R. 491 (D.N.J. 2005) ........................................................................24

*Local Loan Co. v. Hunt*,
 292 U.S. 234 (1934) ...................................................................................17

*In re MCorp Fin, Inc.*,
 160 B.R. 941 (S.D. Tex. 1993) ...................................................................41

*In re New Century TRS Holdings, Inc.*,
 390 B.R. 140 (Bankr. D. Del. 2008) .............................................................6

*In re NII Holdings, Inc.*,
 288 B.R. 356 (Bankr. D. Del. 2002) ...........................................................24

*In re Nutritional Sourcing Corp.*,
 398 B.R. 816 (Bankr. D. Del. 2008) .............................................................6

*In re Oakwood Homes Corp.*,
 329 B.R. 19 (D. Del. 2005)..........................................................................41

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*,
 267 F.3d 340 (3d Cir. 2001).........................................................................18

*Orlick v. Kozyak (In re Fin. Federated Title & Trust, Inc.)*,
 309 F.3d 1325 (11th Cir. 2002) ..................................................................18

*In re Owens Corning*,
 419 F.3d 195 (3d Cir. 2005)..........................................................46, 47, 48

*In re PPI Enters. (U.S.), Inc.*,
 228 B.R. 339 (Bankr. D. Del. 1998) ...........................................................24

*In re PTL Holdings LLC*,
 No. 11-12676 (BLS), 2011 Bankr. LEXIS 4436 (Bankr. D. Del. Nov. 10,
 2011) ...........................................................................................................17

*In re PWS Holding Corp.*,
 228 F.3d 224 (3d Cir. 2000)...........................................................16, 23, 24

*In re Residential Capital, LLC*,
 497 B.R. 720 (Bankr. S.D.N.Y. 2013) .......................................................40

*In re Resorts Int'l, Inc.*,
 145 B.R. 412 (Bankr. D.N.J. 1990) .............................................................24

*In re Rubicon U.S. REIT, Inc.*,
434 B.R. 168 (Bankr. D. Del. 2010) ....................................................................36

*Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*,
407 B.R. 576 (D. Del. 2009) ...............................................................................47

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*,
872 F.2d 36 (3d Cir. 1989) .................................................................................13

*In re Tascosa Petroleum Corp.*,
196 B.R. 856 (D. Kan. 1996) ..............................................................................40

*In re Temple Zion*,
125 B.R. 910 (Bankr. E.D. Pa. 1991) .................................................................38

*Travelers Indem. Co. v. Bailey*,
557 U.S. 137 (2009) ...........................................................................................17

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011) .......................................................17, 49, 50

*In re Tribune Co.*,
476 B.R. 843 (Bankr. D. Del. 2012) .....................................................................7

*In re W.R. Grace & Co.*,
446 B.R. 96 (Bankr. D. Del. 2011) .....................................................................40

*In re W.R. Grace & Co.*,
729 F.3d 311 (3d Cir. 2013).................................................................................7

*In re Wash. Mut., Inc.*,
2012 U.S. Dist. LEXIS 51184 (D. Del. Jan. 19, 2012)........................................41

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ...................................................................17

*In re White Farm Equip. Co.*,
38 B.R. 718 (N.D. Ohio 1984).............................................................................40

*Zazzali v. AFA Fin. Grp., LLC (In re DBSI, Inc.)*,
477 B.R. 504 (Bankr. D. Del. 2012) ...................................................................22

STATUTES & RULES

11 U.S.C. § 510........................................................................................................................36

11 U.S.C. § 721........................................................................................................................28

11 U.S.C. § 1122.................................................................................................................7, 8, 9

11 U.S.C. § 1122(a)...................................................................................................................6, 7

11 U.S.C. § 1122(b)....................................................................................................................31

11 U.S.C. § 1123(a).....................................................................................................................8

11 U.S.C. § 1123(a)(1)............................................................................................................8, 9

11 U.S.C. § 1123(a)(2).................................................................................................................9

11 U.S.C. § 1123(a)(3).................................................................................................................9

11 U.S.C. § 1123(a)(4).....................................................................................................9, 10, 40

11 U.S.C. § 1123(a)(5)................................................................................................................10

11 U.S.C. § 1123(a)(6).........................................................................................................10, 11

11 U.S.C. § 1123(a)(7)................................................................................................................11

11 U.S.C. § 1123(a)(8)................................................................................................................12

11 U.S.C. § 1123(b)............................................................................................................12, 16

11 U.S.C. § 1123(b)(1)...............................................................................................................12

11 U.S.C. § 1123(b)(2)........................................................................................................12, 13

11 U.S.C. § 1123(b)(3)........................................................................................................14, 15

11 U.S.C. § 1123(b)(6)........................................................................................................17, 18

11 U.S.C. § 1125(e)............................................................................................................16, 17

11 U.S.C. § 1126(f)....................................................................................................................29

11 U.S.C. § 1126(g)....................................................................................................................30

11 U.S.C. § 1129(a)(1)...........................................................................................................6, 36

11 U.S.C. § 1129(a)(2)...............................................................................................................23

11 U.S.C. § 1129(a)(3)..................................................................................................24

11 U.S.C. § 1129(a)(4)..............................................................................................24, 25

11 U.S.C. § 1129(a)(5)..............................................................................................25, 26

11 U.S.C. § 1129(a)(6)..................................................................................................26

11 U.S.C. § 1129(a)(7)........................................................................................26, 29, 40

11 U.S.C. § 1129(a)(7)(A)(ii) ......................................................................................26

11 U.S.C. § 1129(a)(8)..............................................................................................29, 35

11 U.S.C. § 1129(a)(9)......................................................................................30, 31, 32

11 U.S.C. § 1129(a)(10)............................................................................32, 33, 49, 50

11 U.S.C. § 1129(a)(11)..........................................................................................33, 34

11 U.S.C. § 1129(a)(12)..................................................................................................34

11 U.S.C. § 1129(a)(13)..................................................................................................34

11 U.S.C. § 1129(a)(14)..................................................................................................34

11 U.S.C. § 1129(a)(15)..................................................................................................34

11 U.S.C. § 1129(a)(16)..................................................................................................34

11 U.S.C. § 1129(b)(1)....................................................................................................35

11 U.S.C. § 1129(b)(2)....................................................................................................37

11 U.S.C. § 1129(b)(2)(A)–(C)....................................................................................37

11 U.S.C. § 1129(c)..........................................................................................................39

11 U.S.C. § 1129(d)..........................................................................................................39

11 U.S.C. § 1129(e)..........................................................................................................39

28 U.S.C. § 1930..............................................................................................................34

Fed. R. Bankr. P. 9011(b)(3).......................................................................................45

Fed. R. Bankr. P. 9019 ..................................................................................................14

**OTHER AUTHORITIES**

7 Richard Levin & Henry J. Sommer, *Collier on Bankruptcy* ¶ 1129.02[2] (16th
    ed. rev. 2018) .................................................................................................................23

BLACK'S LAW DICTIONARY (7th ed. 1999) ..............................................................................18

Douglas G. Baird & Robert K. Rasmussen, *The End of Bankruptcy*, 55 STAN. L.
    REV. 751 (2002) ..............................................................................................................40

Fast Answers — Ponzi Schemes, U.S. Securities and Exchange Commission,
    *available at* http://www.sec.gov/answers/ponzi.htm .............................................19

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ...........................................6

Case 17-12560-BLS    Doc 2627    Filed 05/10/18    Page 13 of 65

Woodbridge Group of Companies, LLC ("WGC") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases") hereby submit this memorandum of law (the "Memorandum") in support of confirmation, pursuant to section 1129 of title 11 of the United States Code , 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), of the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* [Docket No. 2397] (as amended, supplemented, or modified from time to time pursuant to the terms thereof, the "Plan").[2]  In support thereof, the Debtors rely on the *Declaration of Bradley D. Sharp in Support of Confirmation of the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* (the "Sharp Declaration"), the *Declaration of Frederick Chin in Support of Confirmation of the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* (the "Chin Declaration"), and the *Declaration of Soneet Kapila* (the "Kapila Declaration" and, together with the Sharp Declaration and the Chin Declaration, the "Confirmation Declarations") filed substantially contemporaneously herewith and the *Declaration of Emily Young of Epiq Certifying the Methodology for the Tabulation of Votes on and Results of Voting with Respect to the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and its Affiliated Debtors* (the "Voting Certification") filed on October 19, 2018, and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Plan represents the culmination of the Debtors' focused efforts to effectuate an orderly, value-maximizing liquidation of their business and their Estates in a fashion to

---

[2]      All capitalized terms used but not otherwise defined herein have the meanings set forth in the Plan.

produce meaningful recoveries for investors and other creditors as quickly as possible. The Debtors have engaged in extensive, good faith negotiations regarding the Plan with representatives of the key creditor constituencies in these Chapter 11 Cases—the three official Committees. Since February 2018, the Debtors have focused on winding down their affairs, including by way of Bankruptcy Court-approved sales of various real properties. In addition, the Debtors have entered into and consummated several settlement agreements during the Chapter 11 Cases, also as approved by the Bankruptcy Court.

2.      As described in more detail in the Disclosure Statement, the Plan provides for an estimated 60%-70% recovery for Holders of Standard Note Claims, General Unsecured Claims, and Non-Debtor Loan Note Claims and an estimated 40%-50% recovery for Holders of Unit Claims. In addition, the Plan provides for satisfaction of all Allowed Administrative Claims, Professional Fee Claims, Priority Tax Claims, DIP Claims, Other Secured Claims, and Priority Claims, consistent with section 1129 of the Bankruptcy Code.

3.      Following entry of the order approving the Disclosure Statement [Docket No. 2396] (the "Disclosure Statement Order"), the Debtors solicited votes on the Plan from all Creditors entitled to vote. The deadline to vote has passed and, as is evidenced by the Voting Certification, the Plan enjoys overwhelming creditor support. The following table summarizes the overall voting results:

Case 19-12367-BLS   Doc 2628   Filed 05/10/21   Page 15 of 65

| CLASS | TOTAL BALLOTS RECEIVED | | | |
|---|---|---|---|---|
| | Accept | | Reject | |
| | AMOUNT (% of Amount Voted) | NUMBER (% of Number voted) | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) |
| Class 3 – Standard Note Claims | $643,087,310.07 (94.83%) | 5,718 (95.13%) | $35,069,584.27 (5.17%) | 293 (4.87%) |
| Class 4 – General Unsecured Claims | $6,906,390.41 (99.84%) | 38 (97.44%) | $11,160 (0.16%) | 1 (2.56%) |
| Class 5 – Unit Claims | $193,674,404.20 (96.76%) | 971 (97.00%) | $6,487,594.43 (3.24%) | 30 (3.00%) |
| Class 6 – Non-Debtor Loan Note Claims | $428,000 (53.17%) | 6 (50.00%) | $377,000 (46.83%) | 6 (50.00%) |

4.      In the aggregate across all classes, 6,733 of 7,063 votes received (or 95.33%) voted to accept the Plan, and those same accepting votes represented $844,096,104.68 of $886,041,443.38 of all claims for which votes were cast (or 95.27%). These numbers reflect the truly broad and deep support for the Plan among the Debtors' creditor community.

5.      Although Class 6 has rejected the Plan and thus must be crammed down, even the holders of Non-Debtor Loan Note Claims expressed major support for the Plan. Of the 51 Class 6 Ballots that were returned, (i) 39 voted to accept the Plan *and* chose to opt-in to Class 3, in which class their ballots were then counted; (ii) 6 voted to accept the Plan and to remain in Class 6; and (iii) 6 voted to reject the Plan and remain in Class 6. Thus, had all Class 6 claimants remained in their original class, approximately 88.2% of the holders of Non-Debtor Loan Note Claims (representing 91.6% in amount) voted in favor of the Plan.

6.      Also reflective of the broad creditor support is the fact that, in cases of this

magnitude and scope, only the following three objections to confirmation of the Plan were filed:

a)      The *Limited Objection to Confirmation of Plan* filed by the United States,
on behalf of the Internal Revenue Service [Docket No. 2744] (the "IRS
Limited Objection");

b)      The *Limited Objection to Confirmation of Plan* filed by Comerica Bank
[Docket No. 2748] (the "Comerica Limited Objection"); and

c)      The *Objection to Confirmation of Debtors' First Amended Joint Chapter
Plan [sic] of Liquidation* [Docket No. 2767] filed by Lise La Rochelle and
other clients of the Sarachek Law Firm (the "Sarachek Group Objection"
filed by the "Sarachek Parties").

7.      In addition, the following objections to the assumption and assignment of certain

executory contracts and/or the Cure Payments associated therewith were filed:

a)      The *Objection of the I-Grace Company to Cure Amount Proposed in Plan
Supplement [etc.]* filed by The I-Grace Company [Docket No. 2745] (the
"I-Grace Cure Objection");

b)      The *Conditional Objection of G3 Group LA, Inc. to Assumption and
Objection to Cure Amounts Proposed in Plan Supplement [etc.]* [Docket
No. 2749] (the "G3 Group Cure Objection"); and

c)      The *Joinder in Objection of I-Grace and Conditional Objection of D&D
Construction Specialties, Inc. to Assumption and Objection to Cure
Amounts Proposed in Plan Supplement [etc.]* [Docket No. 2750] (the
"D&D Cure Objection" and, together with the I-Grace Cure Objection and
the G3 Group Cure Objection, the "Cure Objections").

8.      The Debtors have revised the proposed form of Confirmation Order to include

language clarifying or addressing the discrete issues raised by the IRS Limited Objection and by

the Comerica Limited Objection.  *See* revised proposed Confirmation Order ¶¶ OO, 44 & 49.  As

such, there should be no remaining issues for the Court to resolve regarding those objections.

9.      The Debtors have also negotiated with the counterparties regarding the three Cure

Objections and reached consensual resolutions of the issues raised thereby.  As such, there also

should be no issues for the Court to resolve on this front.

10.     The **only** open issues, therefore, are those raised by the Sarachek Group Objection.  As the Court is well aware, the Sarachek Parties have been extremely active in these Chapter 11 Cases, including objecting to numerous requests for relief on multiple occasions (such as with respect to property sales, an extension of exclusivity, and a liquidity facility) and filing multiple adversary proceedings, one of which was recently dismissed by the Court.  None of the issues raised by the Sarachek Group Objection are legitimate objections to confirmation of the Plan.  The Sarachek Group Objection is addressed further in Part XVI, *infra*.

11.     As evidenced by the liquidation analysis attached to the Disclosure Statement [Docket No. 2398, Exhibit B] and the discussion set forth in the Disclosure Statement and the Confirmation Declarations, the Plan represents a positive outcome for all Creditors and is well within the statutory requirements and priorities contained in the Bankruptcy Code.

12.     As such, and for all the reasons set forth below and in the Confirmation Declarations, the Debtors respectfully submit that the Plan should be confirmed.[3]

## FACTS

13.     The pertinent facts relating to these Chapter 11 Cases and the Plan are set forth in the Disclosure Statement, the Plan, the Plan Supplement, the Voting Certification, and the Confirmation Declarations, and are incorporated herein by reference.

## THE PLAN MEETS THE REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129 OF THE BANKRUPTCY CODE

14.     "For the court to confirm a plan, the plan proponents must establish by a preponderance of the evidence that the plan satisfies each of the requirements of 11 U.S.C.

---

[3]     The Debtors have separately filed the *Debtors' Motion for Approval of Certain Compromises and Settlements, Partial Substantive Consolidation, and Related Relief with Respect to the Plan* [Docket No. 2721] (the "Plan Settlements Motion").  The Plan Settlements Motion, which no one has opposed, seeks approval of certain compromises and settlements that are encompassed within the Plan, as well as partial substantive consolidation, in each case independent of the Plan to the extent necessary or appropriate.  In the interests of efficiency, this Memorandum does not repeat the discussion or argument contained the Plan Settlements Motion.

§ 1129(a)."[4]  Through this Memorandum, the record of these Chapter 11 Cases, the Voting

Certification, the Confirmation Declarations, and any additional evidence that may be presented

at the Confirmation Hearing, the Debtors will demonstrate, by a preponderance of the evidence,

that all applicable subsections of section 1129 of the Bankruptcy Code have been satisfied with

respect to the Plan.  Accordingly, the Plan should be confirmed.

## I.      Section 1129(a)(1): The Plan Complies with the Applicable Provisions of the Bankruptcy Code

15.     Section 1129(a)(1) of the Bankruptcy Code requires that a plan must "compl[y]

with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(1).  The

legislative history of section 1129(a)(1) indicates that this provision encompasses the

requirements of sections 1122 and 1123 of the Bankruptcy Code governing the classification of

claims and contents of a chapter 11 plan, respectively.[5]  As demonstrated below, the Plan

complies with the requirements of sections 1122 and 1123, and all other applicable provisions of

the Bankruptcy Code.

### A.      The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code

16.     Section 1122 of the Bankruptcy Code provides that the claims or interests within

a given plan class must be "substantially similar."  11 U.S.C. § 1122(a).  Section 1122 of the

Bankruptcy Code, however, does not require that all substantially similar claims or equity

interests must be classified together.[6]  Instead, the case law is clear that similar claims—which

---

[4]     *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) (citing *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006), and *In re New Century TRS Holdings, Inc.,* 390 B.R. 140, 158 (Bankr. D. Del. 2008)).

[5]     H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963; *see also Nutritional Sourcing*, 398 B.R. at 824.

[6]     *See In re Jersey City Medical Center*, 817 F.2d 1055, 1060–61 (3d Cir. 1987) ("The express language of this statute explicitly forbids a plan from placing dissimilar claims in the same class; it does not, though, address the presence of similar claims in different classes. … Accordingly, we agree with the general view which permits

courts have interpreted "as a reflection of the legal attributes of the claims"[7]—may be classified

separately, provided there is a reasonable basis for the separate classification.[8]  Courts are

afforded broad discretion in approving a plan proponent's classification structure considering the

specific facts of each case.[9]

17.     Here, the Plan provides for separate classification of Claims against and Equity

Interests in the Debtors based on differences in the economic nature, legal rights, or priority of

such Claims and Equity Interests.  The Plan designates the following eight Classes: Class 1

(Other Secured Claims), Class 2 (Priority Claims), Class 3 (Standard Note Claims), Class 4

(General Unsecured Claims), Class 5 (Unit Claims), Class 6 (Non-Debtor Loan Note Claims),

Class 7 (Subordinated Claims), and Class 8 (Equity Interests).  *See* Plan § 2.1.  Classes 1 through

7 constitute Classes of Claims and Class 8 constitutes a Class of Equity Interests.  *Id.*

---

the grouping of similar claims in different classes."); *In re Tribune Co.*, 476 B.R. 843, 854–55 (Bankr. D. Del. 2012) ("Section 1122(a) is mandatory in one respect: only substantially similar claims may be classified together.  Yet, Section 1122(a) is permissive is this respect: it does *not* provide that *all* similar claims must be placed in the same class."); *In re Coram Healthcare Corp.*, 315 B.R. 321, 348 (Bankr. D. Del. 2004) ("Section 1122 of the Code provides that claims that are not 'substantially similar' may not be placed in the same class; it does not expressly prohibit placing 'substantially similar' claims in separate classes.  In fact, the Third Circuit has approved separate classification of unsecured claims." (citation omitted)); *accord Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 661 (6th Cir. 2002) ("Section 1122(a) does not demand that all similar claims be in the same class.  To the contrary, the bankruptcy court has substantial discretion to place similar claims in different classes." (citation omitted)).

[7]  *In re Tribune Co.*, 476 B.R. at 855 (internal quotation marks omitted), *cited with approval, In re W.R. Grace & Co.*, 729 F.3d 311, 326 (3d Cir. 2013).

[8]  *See, e.g.*, *In re Coastal Broad. Sys.*, 570 Fed. App'x 188, 193 (3d Cir. 2014) ("Although not explicit in § 1122, a corollary to that rule is that the 'grouping of similar claims in different classes' is permitted so long as the classification is 'reasonable.'"); *John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (concluding that separate classification of similar claims is permissible where the classification scheme is reasonable); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159–60 (Bankr. D. Del. 2006) (separate classification is permissible when a reasonable basis exists for the classification structure); *In re Tribune Co.*, 476 B.R. at 856–57 (separate classification appropriate where reasonable); *In re Deep River Warehouse, Inc.*, No. 04-52749, 2005 WL 2319201, at *6 (Bankr. M.D.N.C. Sept. 22, 2005) (separate classification of similar claims is permissible where "a legitimate (i.e., non-manipulative) business reason exists to justify the separate classification of claims"); *In re Chateaugay Corp.*, 177 B.R. 176, 186–87 (S.D.N.Y. 1995) (concluding separate classification of similar claims was appropriate where a business reason justified the classification scheme).

[9]  *See, e.g.*, *In re Jersey City Med. Ctr.*, 817 F.2d at 1060–61 (observing that "Congress intended to afford bankruptcy judges broad discretion [under section 1122] to decide the propriety of plans in light of the facts of each case").

7

18.    The Plan's classification scheme complies with section 1122 of the Bankruptcy Code because each Class of Claims or Equity Interests contains only Claims or Equity Interests that are substantially similar in nature and priority to the other Claims or Equity Interests within such Class and dissimilar Claims or Equity Interests have not been placed in the same Class.  In particular, the Debtors have separately classified Secured Claims, Priority Claims, General Unsecured Claims, and Subordinated Claims, because each of these Classes of Claims is entitled to a different priority under the Bankruptcy Code.  Standard Note Claims have also been classified separately from Unit Claims and Non-Debtor Loan Note Claims in reflection of their differing legal rights.  Finally, there is only one Class of Equity Interests.  These are reasonable and appropriate classes under the Plan, none of which was established with the intent to create an impaired accepting class.[10]  *See* Sharp Decl. ¶ 41.

19.    Accordingly, the classification of Claims and Equity Interests in the Plan satisfies section 1122 of the Bankruptcy Code.

### B.    The Plan Complies with Section 1123(a) of the Bankruptcy Code

20.    Section 1123(a) of the Bankruptcy Code sets forth eight requirements for the contents of a chapter 11 plan.  11 U.S.C. § 1123(a).  As shown below, the Plan complies with each of these requirements, to the extent applicable.

### (a)    Section 1123(a)(1): Designation of Classes of Claims and Equity Interests

21.    Section 1123(a)(1) of the Bankruptcy Code requires that a chapter 11 plan designate classes of claims and equity interests, subject to section 1122 of the Bankruptcy Code. As discussed above, in addition to Administrative Claims, Professional Fee Claims, Priority Tax

---

[10]    *See, e.g.*, *In re Abeinsa Holding, Inc.*, 562 B.R. 265, 274–75 (Bankr. D. Del. 2016) (finding that classification scheme was appropriate when there were reasonable differences between the classes and multiple impaired classes voted to accept the plan).

Claims, and DIP Claims that need not be classified, the Plan designates seven Classes of Claims

and one Class of Equity Interests, subject to section 1122 of the Bankruptcy Code. *See* Plan

§ 2.1. Thus, the Plan satisfies the requirement of section 1123(a)(1) of the Bankruptcy Code.

### (b)    Section 1123(a)(2): Classes that Are Not Impaired by the Plan

22.    Section 1123(a)(2) of the Bankruptcy Code requires that a chapter 11 plan specify

which classes of claims or equity interests are unimpaired under such plan. The Plan specifies

that Class 1 (Other Secured Claims) and Class 2 (Priority Claims) are Unimpaired under the

Plan. *See* Plan §§ 2.1, 3.2 & 3.3. Thus, the Plan satisfies the requirement of section 1123(a)(2)

of the Bankruptcy Code.

### (c)    Section 1123(a)(3): Treatment of Classes that Are Impaired by the Plan

23.    Section 1123(a)(3) of the Bankruptcy Code requires that a chapter 11 plan specify

how the classes of claims or equity interests that are impaired under such plan will be treated.

The Plan designates Class 3 (Standard Note Claims), Class 4 (General Unsecured Claims), Class

5 (Unit Claims), Class 6 (Non-Debtor Loan Note Claims), Class 7 (Subordinated Claims), and

Class 8 (Equity Interests) as Impaired and specifies the treatment of Claims and Equity Interests

in such Classes. *See* Plan §§ 2.1 & 3.4–3.9. Thus, the Plan satisfies the requirement of section

1123(a)(3) of the Bankruptcy Code.

### (d)    Section 1123(a)(4): Equal Treatment Within Each Class

24.    Section 1123(a)(4) of the Bankruptcy Code requires that a chapter 11 plan provide

the same treatment for each claim or interest within a particular class, unless the holder of a

claim or interest agrees to receive less favorable treatment than other class members. Pursuant to

the Plan, the treatment of each Claim against or Equity Interest in the Debtors, in each respective

Class, is the same as the treatment of each other Claim or Equity Interest in such Class, unless a

particular Holder has agreed to receive less favorable treatment than other members in such

Class.  *See* Plan §§ 3.2–3.9.  Thus, the Plan satisfies the requirement of section 1123(a)(4) of the

Bankruptcy Code.

### (e)      Section 1123(a)(5): Adequate Means for Implementation

25.     Section 1123(a)(5) of the Bankruptcy Code requires that a chapter 11 plan provide

"adequate means for the plan's implementation."  11 U.S.C. § 1123(a)(5).  Article V of the Plan

describes the implementation of the Plan.  Specifically, the Plan provides adequate means for

implementation of the Plan through, among other things, (i) the establishment of the Wind-Down

Entity and the Liquidation Trust and the vesting of the Wind-Down Assets and Liquidation Trust

Assets in those entities; (ii) the appointment of the Wind-Down CEO, the Liquidation Trustee,

and the Remaining Debtors Manager, as well as the Wind-Down Board and the Liquidation

Trust Supervisory Board; (iii) the dissolution of certain Debtors and provisions regarding the

Remaining Debtors; (iv) the contribution of the Contributed Claims to the Liquidation Trust for

potential prosecution along with the other Liquidation Trust Actions also made available to the

Liquidation Trust; (v) the cancellation of certain prepetition instruments and other documents;

(vi) substantive consolidation of certain Debtors with other Debtors; and (vii) the making of

Distributions by the Liquidation Trust and, as applicable, the Wind-Down Entity in accordance

with the Plan.  *See* Plan Art. V.  Thus, the Plan satisfies the requirement of section 1123(a)(5) of

the Bankruptcy Code.

### (f)      Section 1123(a)(6): Prohibitions on Issuance of Non-Voting Securities

26.      The Plan does not provide for the issuance of any non-voting equity securities of

any corporation, and each of the Debtors will eventually be dissolved under the Plan.  As of the

Effective Date, the organizational documents of each Debtor shall be deemed amended to the

extent necessary to carry out the provisions of the Plan.  *Id.* § 5.2.4.  Thus, to the extent

applicable, section 1123(a)(6) of the Bankruptcy Code is satisfied.

### (g)     Section 1123(a)(7): Provisions Regarding Directors and Officers

27.     Section 1123(a)(7) of the Bankruptcy Code requires that the Plan "contain only

provisions that are consistent with the interests of creditors and equity security holders and with

public policy with respect to the manner of selection of any officer, director, or trustee under the

plan and any successor to such officer, director, or trustee."  11 U.S.C. § 1123(a)(7).  Here,

Section 5.3 of the Plan provides for the creation of the Wind-Down Entity and for the

appointment of the Wind-Down CEO and the Wind-Down Board to serve with respect to the

Wind-Down Entity, including with the authority detailed in Section 5.3.4 of the Plan and in the

Wind-Down Governance Agreement.  The initial Wind-Down CEO was selected by consensus

of the three Committees with his compensation terms disclosed in the Plan Supplement, and any

successor Wind-Down CEO will be appointed pursuant to Section 5.3.7 of the Plan.  Section 5.4

of the Plan provides for the creation of the Liquidation Trust and for the appointment of the

Liquidation Trustee and the Liquidation Trust Supervisory Board to serve with respect to the

Liquidation Trust, including with the authority detailed in Section 5.4.5 of the Plan and in the

Liquidation Trust Agreement.  The initial Liquidation Trustee was selected by consensus of the

three Committees with his compensation terms set forth in Section 5.4.1(a) of the Plan, and any

successor Liquidation Trustee will be appointed pursuant to the Liquidation Trust Agreement.

28.     Accordingly, the Plan's provisions related to the selection of directors, officers,

and trustees are consistent with the interests of Holders of Claims and with public policy, thus

satisfying the requirement of section 1123(a)(7) of the Bankruptcy Code.

Case 17-12307-BLS   Doc 2627   Filed 05/10/18   Page 23 of 64

      **(h)**       **Section 1123(a)(8): Provisions Regarding Treatment of Earnings and Future Income**

29.     Section 1123(a)(8) of the Bankruptcy Code applies to cases where the debtor is an individual and, accordingly, is inapplicable to the Debtors and the Plan.

      **C.**       **The Plan Complies with Section 1123(b) of the Bankruptcy Code**

30.     Section 1123(b) sets forth various permissive provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) provides that a plan may:  (i) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates; (ii) impair or leave unimpaired any class of claims or interests; (iii) provide for the assumption or rejection of executory contracts and unexpired leases; and (iv) include any other appropriate provision not inconsistent with the applicable provisions of title 11.

      **(a)**       **Impairment/Unimpairment of Claims and Equity Interests**

31.     Section 1123(b)(1) of the Bankruptcy Code provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests."  11 U.S.C. § 1123(b)(1).  As discussed above, Claims and Equity Interests in Classes 3, 4, 5, 6, 7, and 8 are Impaired under the Plan and Claims in Classes 1 and 2 are Unimpaired under the Plan.  Thus, the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

      **(b)**       **Assumption/Rejection of Executory Contracts and Leases**

32.     Section 1123(b)(2) of the Bankruptcy Code allows a chapter 11 plan to provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases.  *See* 11 U.S.C. § 1123(b)(2).  Article VI of the Plan provides that, on the Effective Date, (i) the Debtors shall assume all executory contracts and unexpired leases that are listed on the Schedule of Assumed Agreements and shall assign such contracts and leases to the

Wind-Down Entity and (ii) the Debtors shall reject all other executory contracts and unexpired leases, subject to certain specified exceptions.  *See* Plan §§ 6.1.1 & 6.2.1.

33.     Assumption or rejection of an executory contract or unexpired lease of a debtor is subject to judicial review under the business judgment standard.[11]  This standard is satisfied when a debtor determines that assumption or rejection will benefit the estate.[12]  Here, the Debtors have exercised sound business judgment in identifying the executory contracts and unexpired leases to be assumed and rejected pursuant to the Plan.  In particular, the Debtors have determined (i) to assume those contracts and leases that may be necessary for the Wind-Down Entity to carry out its duties under the Plan and effectuate the orderly wind down of the Wind-Down Assets and (ii) to reject those contract and leases that are no longer necessary for those purposes and that would otherwise be a burden on the Estates.  *See* Sharp Decl. ¶ 42; Chin Decl. ¶ 20.

34.     The treatment of executory contracts and unexpired leases in the Plan is thus consistent with section 1123(b)(2) of the Bankruptcy Code.  Accordingly, the Debtors respectfully request that the Bankruptcy Court approve the assumptions, assignments, and rejections in accordance with the Plan and the Schedule of Assumed Agreements.

### (c)     Cure Amounts

35.     Article VI of the Plan provides procedures for determining Cure Payments with respect to assumed executory contracts and unexpired leases.  The Debtors have designated a Cure Payment amount and sent a *Notice of (I) Assumption and Assignment of Contracts and Leases, (II) Fixing of Cure Amounts, and (III) Deadline to Object Thereto* [Docket No. 2659] (the "Assumption Notice") to all counterparties to executory contracts and unexpired leases to be

---

[11]     *See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3d Cir. 1989).

[12]     *See, e.g., id.*

13

assumed and assigned as set forth in the Plan.  As noted, the Cure Objections have been

consensually resolved.  No other counterparties filed objections to the Cure Payment amounts or

otherwise objected to the assumption and assignment of contracts and leases proposed in the

Assumption Notice and the deadline to object to the proposed assumption and assignment or

Cure Payment amount has passed.

36.    The Debtors submit that the Cure Payment amounts set forth in the Assumption

Notice should be approved as the requisite Cure Payments with respect to the executory contracts

and unexpired leases included therein (unless otherwise agreed between the Debtors and the

applicable counterparty) for all executory contracts and unexpired leases for which no objection

to Cure Payment, assumption, or assignment was filed by the objection deadline.

**(d)    Compromises and Settlements Under and in Connection with the Plan**

37.    Section 1123(b)(3) of the Bankruptcy Code allows a Plan to provide for "the

settlement or adjustment of any claim or interest belonging to the debtor or to the estate" or "the

retention and enforcement by the debtor, the trustee, or by a representative of the estate

appointed for such purpose, of any such claim or interest."  11 U.S.C. § 1123(b)(3).

(i)    Compromises and Settlements

38.    As permitted by section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule

9019, the Plan reflects and incorporates several settlements and compromises.  The compromises

and settlements pursuant to and in connection with the Plan are fair, reasonable, and in the best

interests of the Debtors and the Estates for the reasons detailed in the Plan Settlements Motion.

(ii)    Causes of Action

39.    Section 1123(b)(3)(B) states that a plan may "provide for the retention and

enforcement . . . by a representative of the estate appointed for such purpose, of any . . . claim or

interest [belonging to the debtor or to the estate]."  11 U.S.C. § 1123(b)(3)(B).  The Plan

provides that the Liquidation Trust, as a successor in interest to the Debtors, the Estates, and the

Contributing Claimants, may, and will have the exclusive right, power, and interest on behalf of

itself, the Debtors, the Estates, and the Contributing Claimants to institute, commence, file,

pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw

any and all Liquidation Trust Actions.  *See* Plan § 5.4.15.  These provisions are consistent with,

and supported by, section 1123(b)(3)(B) of the Bankruptcy Code.

### (e)        Releases, Exculpations, and Limitations of Liability

40.        As is customary, the Plan includes release, exculpation, and limitation of liability

provisions.  *See* Plan §§ 11.11–11.12.  The release provisions are narrowly drawn and do not

include so-called "third-party" or "non-debtor" releases that would release anyone from claims

that could not be asserted on behalf of the Debtors or their Estate.  These provisions are proper

because, among other things, they are the product of arm's length negotiations, have been critical

to obtaining the support of the various constituencies for the Plan, and have received support

from the Creditors that voted for the Plan.

41.        The collective efforts of the Released Parties during the course of the Debtors'

Chapter 11 Cases helped preserve the value of the Estates and assisted the Debtors in pursuing an

orderly and value maximizing liquidation, which the Debtors strongly believe is superior to the

disorderly and uncertain alternatives.  *See* Sharp Decl. ¶ 33.  Each of the Released Parties

advanced and maintains the common goal of confirming the Plan, which demonstrates an

identity of interest sufficient to support the releases.[13]  Moreover, such release provisions are fair

and equitable, are given for valuable consideration, and are in the best interests of the Debtors

and their Estates.  These provisions are consistent with the Bankruptcy Code and, thus, the

---

[13]    *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013).

requirements of section 1123(b) of the Bankruptcy Code are satisfied.  All of the relevant factors support approval of the focused and tailored Estate releases to be effected through the Plan.[14]

42.    The concerns about the Plan's releases raised by the IRS Limited Objection have been addressed by adding language to the form of Confirmation Order expressly stating that the Plan does not (i) release any non-debtor Person from claims of the United States related to the violation of any federal tax; or (ii) enjoin, limit, impair, or delay the United States from commencing or continuing any actions, proceedings, or investigations against any non-debtor Person in any forum for claims related to the violation of any federal tax laws.  *See* revised proposed Confirmation Order ¶ 44.  This language is similar to additional language that was added with respect to the SEC.  *See id.* ¶ 43.

43.    The exculpation and limitation of liability provision is also proper.  This provision is subject to a standard carve out for acts or omissions constituting actual fraud or willful misconduct by an Exculpated Party as determined by a Final Order.  *See* Plan § 11.12. Moreover, the Third Circuit Court of Appeals has recognized that a chapter 11 plan may provide for broad exculpation of liability in favor of estate fiduciaries in connection with their implementation of a debtor's exit from bankruptcy.[15]  Indeed, section 1125(e) of the Bankruptcy Code provides for the exculpation of liability for actions taken in connection with the solicitation of a plan or the making of distributions thereunder.  *See* 11 U.S.C. § 1125(e).  Accordingly, numerous courts in this and other districts have upheld exculpation provisions that protect parties

---

[14]    *See, e.g.*, *In re Abeinsa Holding, Inc.*, 562 B.R. at 285 ("Another key consideration to approval of the Debtors' Release is the support of the Creditors' Committee, because that entity has the greatest incentive to limit the Debtors' Release to preserve any potential claims.  Also, the classes entitled to vote on the Plan overwhelmingly voted to accept it.  No creditors have objected to the broad Debtors' Release.").

[15]    *In re PWS Holding Corp.*, 228 F.3d 224, 246–47 (3d Cir. 2000) (approving a plan with an exculpation provision that protected the debtors, creditor representatives, and the committee as well as their professionals and agents from liability to holders of claims or equity interest for acts or omissions in connection with, related to, or arising out of, the bankruptcy cases, the pursuit of confirmation of the plan, or any distributions to be made thereunder).

from acts or omissions related to the debtors' restructuring efforts and/or the pursuit, confirmation, and consummation of a chapter 11 plan.[16]

44.     The exculpation and limitation of liability provision contained in Section 11.12 of the Plan is consistent with the foregoing standards and should be approved. The Exculpated Parties have participated in good faith in formulating and negotiating the Plan, and they are entitled to protection from exposure to claims against them relating to their participation in the Chapter 11 Cases, consistent with section 1125(e) of the Bankruptcy Code. *See* 11 U.S.C. § 1125(e). Finally, interested parties received sufficient notice of the exculpation provision and had ample time to raise any objections thereto, and no such objections were filed.

### (f)     Other Appropriate Provisions Not Inconsistent with the Applicable Provisions of the Bankruptcy Code

45.     Section 1123(b)(6) of the Bankruptcy Code is a "catchall" mechanism which permits a chapter 11 plan to include any appropriate provision as long as such provision is not inconsistent with applicable sections of the Bankruptcy Code.

### (i)     Retention of Jurisdiction

46.     Article X of the Plan provides that, among other things, the Bankruptcy Court will retain jurisdiction over various matters in connection with, arising out of, or related to the Chapter 11 Cases and the Plan. The post-confirmation retention of jurisdiction by the Bankruptcy Court is permitted by the Bankruptcy Code.[17] The continuing jurisdiction of the

---

[16]     *See, e.g.*, *In re Wash. Mut., Inc.*, 442 B.R. 314, 350–51 (Bankr. D. Del. 2011) (approving plan's exculpation clauses); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) (same); *In re Tribune Co.*, 464 B.R. at 189 (same); *In re PTL Holdings LLC*, No. 11-12676 (BLS), 2011 Bankr. LEXIS 4436, at *38 (Bankr. D. Del. Nov. 10, 2011) (same).

[17]     *See, e.g.*, *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 146 & 151 (2009) ("the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders"); *Local Loan Co. v. Hunt*, 292 U.S. 234, 239 (1934) (same); *Gruen Mktg. Corp. v. Asia Commercial Co. (In re Jewelcor Inc.)*, 150 B.R. 580, 582 (Bankr. M.D. Pa. 1992) ("There is no doubt that the bankruptcy court's jurisdiction continues post confirmation to protect its confirmation decree, to prevent interference with the execution of the plan and to aid otherwise in its operation." (internal citations omitted)).

Bankruptcy Court, as set forth in Article X of the Plan, is appropriate and wholly consistent with applicable law.

(ii)    Ponzi Scheme Findings

47.    Section 3.11.2(f) of the Plan provides that certain findings will be sought in the Confirmation Order regarding how Robert Shapiro ("Shapiro") conducted a significant Ponzi scheme through the Debtors.  More specifically, the proposed form of Confirmation Order provides:

> **Conduct of a Ponzi Scheme.**  The evidence demonstrates, and the Bankruptcy Court hereby finds, that (i) beginning no later than July 2012 through December 1, 2017, Robert H. Shapiro used his web of more than 275 limited liability companies, including the Debtors, to conduct a massive Ponzi scheme raising more than $1.22 billion from over 8,400 unsuspecting investors nationwide; (ii) the Ponzi scheme involved the payment of purported returns to existing investors from funds contributed by new investors; and (iii) the Ponzi scheme was discovered in December 2017.

48.    The inclusion of these findings in the Confirmation Order is appropriately sought under the Plan pursuant to section 1123(b)(6) and is supported by the record.

49.    A "Ponzi scheme" is broadly defined as "a fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments."  *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 343 n.1 (3d Cir. 2001) (quoting BLACK'S LAW DICTIONARY 1180 (7th ed. 1999)).[18]  The facts here fit this definition.

---

[18]    *See also, e.g.*, *Orlick v. Kozyak (In re Fin. Federated Title & Trust, Inc.)*, 309 F.3d 1325, 1327 n.2 (11th Cir. 2002) ("The term [Ponzi scheme] generally describes a pyramid-type investment scheme where investors are paid profits from newly attracted investors promised large returns on their principal investments. Typically it is not supported by any underlying business venture. An investor that does receive money is not receiving income on his or her investment, but merely a return of his or her own principal, or that of another investor. More and more investors are solicited in order that the investors at the top of the pyramid can be compensated. Usually the pyramid collapses, the majority of investors never receive any profits, losing their principal investment as well."); *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 323 n.1 (3d Cir. 1999) (quoting at length multiple authorities regarding key aspects of a Ponzi scheme); *In re Hedged-Investments Assocs., Inc.*,

18

50.     Under Shapiro's control and during the period from August 2012 through December 1, 2017, the prepetition Debtors raised more than $1.29 billion from over 10,000 unsuspecting investors nationwide by selling those investors two primary products, five-year Units and twelve to eighteen month Notes.  Sharp Decl. ¶ 21.  The Unit transactions provided for a five-year term with a 6% to 10% aggregate annual return paid monthly and a 2% "accrued preferred dividend."  *Id.*  The Note transactions promised Noteholders 5% to 8% annual interest paid monthly with a return of their principal at the end of their Note's term.  *Id.*

51.     Repayment of both Units and Notes, the prepetition Debtors claimed, would be based on the purported revenues the prepetition Debtors purportedly would receive from issuing short-term loans to unrelated third-party property owners.  *Id.* ¶ 22.  As marketed by the prepetition Debtors, the Debtors would make short-term loans, between $1 million and $100 million, to bona-fide third-party commercial property borrowers at high rates of interest, approximately 11%-15%, secured by a first-position mortgage on the property.  *Id.*  These loans to third-parties would supposedly be provided at loan-to-value ratios of approximately 60%-70%.  *Id.*  The result, according to the sales pitch, would be a robust and safe cash-flow stream that would provide revenues for the Fund Debtors to repay the Units and the Notes without issue.  *Id.*

52.     In reality, there was no robust and safe cash flow stream from third party borrowers, as a very small fraction of investor money flowed from the prepetition Fund Debtors

---

48 F.3d 470, 471 n.2 (10th Cir. 1995) (describing a "Ponzi scheme" as "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments," and usually attracting investors by promising them "large returns for their investments"); Fast Answers — Ponzi Schemes, U.S. Securities and Exchange Commission, *available at* http://www.sec.gov/answers/ponzi.htm ("A Ponzi scheme is an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors. Ponzi scheme organizers often solicit new investors by promising to invest funds in opportunities claimed to generate high returns with little or no risk. In many Ponzi schemes, the fraudsters focus on attracting new money to make promised payments to earlier-stage investors to create the false appearance that investors are profiting from a legitimate business.").

to unrelated third parties.  *See* Sharp Decl. ¶ 23.  Rather, Shapiro created disguised affiliates (the

PropCos and MezzCos (each as defined in the Plan Settlements Motion)) to which money was

loaned.  *Id.*  These "borrowers" did not even have bank accounts and clearly they had no ability

to service the required interest payments on an ongoing basis.  *Id.*  In addition, they had no

ability to retire the debt when due, other than through the sale of the underlying property, which

doesn't appear to have been contemplated and certainly wasn't effectuated.  *Id.*  With regard to

sales of real property, the annual cash flow from such sales (which sales were not frequent) was

well below the amount of principal and interest paid by Shapiro to investors.  *See* Sharp Decl.

¶ 24.  In 2013, no properties were sold and approximately $3.4 million was paid to investors in

principal and interest.  *Id.*  In 2014, no properties were sold and approximately $17.6 million was

paid to investors in principal and interest.  *Id.*  In 2015, 10 properties with approximate net

proceeds of $18.5 million were sold and approximately $84.1 million was paid to investors in

principal and interest.  *Id.*  In 2016, 15 properties with approximate net proceeds of $28.4 million

were sold and approximately $138.2 million was paid to investors in principal and interest.  *Id.*

In 2017, 16 properties with approximate net proceeds of $71.4 million were sold and

approximately $181.8 million was paid to investors in principal and interest.  *Id.*  Clearly,

Shapiro knew that he could not make payment of interest and principal only through sales of

properties—the above numbers evidence that there were, in fact, grossly insufficient proceeds to

permit such payments of principal and interest, and there was no other material source of revenue

to pay interest and principal other than from the sale of additional Notes and Units.  *Id.*

53.    Accordingly, instead of being repaid with legitimate business proceeds, the

prepetition Debtors used funds received primarily from new investors to make payments to old

investors.  *See* Sharp Decl. ¶ 25.  In the absence of sufficient cash inflows from sources other

than investors, Shapiro and the prepetition Debtors, which he controlled, paid approximately

$425 million of "interest" and "principal" to existing investors, primarily from funds received

from new investors.  *Id.*  Shapiro also used commingled investor money to pay approximately

$80 million in commissions, primarily to sales agents who sold these fraudulent "investments"

and used investor money to pay at least $30 million for the benefit of Shapiro and his wife, as

well as their related entities (including, for example, purchasing luxury items, travel, wine, and

the like).  *Id.*  While funds from the commingled account were used to purchase the Debtors' real

properties, these purchases were directly contrary to material  representations made to investors.

*Id.*

54.    Moreover, investments were solicited, and payments of "interest" were made to

existing investors, without regard to whether such investors' investment realized value (or even

existed).  *See* Sharp Decl. ¶ 26.  For example, on certain occasions, Shapiro issued Notes in

respect of properties that the Debtors never actually acquired, including properties at 778

Sarbonne Road in Los Angeles and 53 Huron Street in Brooklyn.  *Id.*  Nevertheless, investments

were solicited from investors, and liens and security interests were purportedly granted to the

Fund Debtors, to secure "loans" relating to such properties.  *Id.*  Another example concerns the

property at 800 Stradella Road in Los Angeles, where Shapiro issued about $24.7 million in

"first-lien" Notes for the stated purpose of funding a $26 million Fund Debtor-to-PropCo loan

that was never made (the PropCo instead took a $26 million loan from the third-party seller of

the property at the time of acquisition).  *Id.*  And much like the famous play "The Producers," the

Debtors purchased the "Owlwood Estate" in September 2016 for $90 million, but signed notes to

the Fund Debtors for alleged borrowings in the aggregate amount of $112 million—well above

the purchase price of the property.  *Id.*

55.     In late 2017, Shapiro's fraudulent scheme unraveled. *Id.* ¶ 27.  As federal and state investigations intensified and unfavorable press reports began to emerge, the prepetition Debtors found it increasingly difficult to raise new capital from investors.  *Id.*  As noted above, in classic Ponzi scheme fashion, the prepetition Debtors were reliant on funds from new investors to make the payments promised to existing Unitholders and Noteholders.  *Id.*  When new investment dried up, the inability to make required Notes and Units servicing payments became inevitable; indeed, the prepetition Debtors were unable to make the December 1, 2017 interest and principal payments due on the Notes, which quickly precipitated the filing of the initial Debtors' bankruptcy cases.  *Id.*

56.     On December 20, 2017, the SEC filed a complaint (the "SEC Complaint") against, among other parties, Shapiro and many of the Debtors in the U.S. District Court for the Southern District of Florida as Case No. 1:17-cv-24624-MGC (the "SEC Action").  The SEC Complaint alleged repeatedly and expressly that Shapiro had used the Debtors to conduct a massive Ponzi scheme.  *See, e.g.*, SEC Complaint ¶¶ 1, 3, 41, 47, 87, 93 & 122; Sharp Decl. ¶ 28.  On December 21, 2017, the District Court in the SEC Action entered an order unsealing the SEC Complaint and allowing the docket of the SEC Action to be accessible to the public.

57.     These facts fall readily into the circumstances where courts have found a Ponzi scheme to exist.[19]  Moreover, the Ponzi scheme was discovered by no later than December 21, 2017, when the SEC's detailed account of the scheme was laid bare for the world.

---

[19]     *See, e.g.*, *Zazzali v. AFA Fin. Grp., LLC (In re DBSI, Inc.)*, 477 B.R. 504, 511 (Bankr. D. Del. 2012) (explaining how the debtor's operations would "fit[] the definition of a Ponzi scheme" when the debtor was selling investors "at an inflated price unsupported by the value of the underlying property, and that the proceeds from those sales were used for [the debtor's] operating expenses, including pay-outs to other investors").

Case 17-12307-BLS    Doc 2627    Filed 05/10/18    Page 34 of 64

## II.    Section 1129(a)(2): The Plan Proponents Have Complied with the Applicable Provisions of the Bankruptcy Code

58.    Section 1129(a)(2) of the Bankruptcy Code requires that the "proponent of the plan comply with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(2). Whereas section 1129(a)(1) of the Bankruptcy Code focuses on the form and content of a plan itself, section 1129(a)(2) is concerned with the activities of the plan proponent.[20]  In determining whether the plan proponent has complied with this section, courts focus on whether the proponent has adhered to the disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code.[21]

59.    The Debtors have complied with all disclosure and solicitation requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order governing notice, disclosure, and solicitation in connection with the Plan and the Disclosure Statement.  The Disclosure Statement, the Plan, the Ballots, the Confirmation Hearing notice, and all other related documents were distributed to parties in accordance with the Disclosure Statement Order.  *See* Docket Nos. 2553, 2671, 2689, 2718.  The Confirmation Hearing notice was also timely published once in the national edition of *USA Today* and once in the *Los Angeles Times* on September 5, 2018.  *See* Docket No. 2575.  In addition to the foregoing, the Debtors also have complied with all orders of the Bankruptcy Court entered during the pendency of these Chapter 11 Cases.  Accordingly, the requirement of section 1129(a)(2) of the Bankruptcy Code has been satisfied.

---

[20]    *See* 7 Richard Levin & Henry J. Sommer, *Collier on Bankruptcy* ¶ 1129.02[2] (16th ed. rev. 2018).

[21]    *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d at 248.

Case 17-12307-BLS    Doc 2628    Filed 05/10/21    Page 36 of 65

## III.    Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law

60.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Good faith is generally interpreted to mean that there exists a reasonable likelihood that the "plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[22]  Good faith is to be viewed in light of the particular facts and circumstances of the case.[23]

61.    The Debtors have proposed the Plan in good faith.  Following the appointment of the New Board in February 2018, the Debtors worked to build consensus among the key creditor constituencies.  The Plan and the process leading up to its formulation are the result of extensive arms'-length negotiations among the Debtors, each of the Committees, and other key parties in interest.  *See* Sharp Decl. ¶¶ 6-10.  Accordingly, the requirement of section 1129(a)(3) of the Bankruptcy Code has been satisfied.

## IV.    Section 1129(a)(4): The Plan Provides that Professional Fees and Expenses Are Subject to Bankruptcy Court Approval

62.    Section 1129(a)(4) of the Bankruptcy Code requires that any payments by a debtor "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case," either be approved by the court as reasonable or subject to approval of the court as reasonable.  11 U.S.C. § 1129(a)(4).  Section 1129(a)(4) has been construed to require that all payments on account of professional fees and expenses from estate assets be subject to the Bankruptcy Court's review and approval.[24]

---

[22]    *Id.* at 242 (internal quotation marks and citation omitted).

[23]    *See, e.g.*, *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002); *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 347 (Bankr. D. Del. 1998).

[24]    *See, e.g.*, *Lisanti Foods, Inc. v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 503 (D.N.J. 2005); *In re Resorts Int'l, Inc.*, 145 B.R. 412, 476 (Bankr. D.N.J. 1990).

63.     In accordance with section 1129(a)(4) of the Bankruptcy Code, no payments will be made on account of Professional Fee Claims from the Estates other than payments that are authorized by order of the Bankruptcy Court.  Pursuant to the Plan, all final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court and served upon all parties required to receive notice within forty-five (45) days after the Effective Date, and such Professional Fee Claims are payable only to the extent approved by the Bankruptcy Court.  *See* Plan § 11.2.  The Plan also provides that the Bankruptcy Court shall retain jurisdiction to "hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under Bankruptcy Code sections 327, 328, 330, 331, 363, 503(b), 1103, and 1129(a)(4)."  Plan § 10.1(b).  Accordingly, the requirement of section 1129(a)(4) of the Bankruptcy Code has been satisfied.

## V.    Section 1129(a)(5): The Plan Proponents Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders

64.     Section 1129(a)(5) of the Bankruptcy Code requires (i) that the proponent of a plan disclose the identity and affiliations of the proposed directors, officers, or voting trustees of the debtors, an affiliate of a debtor participating in a joint plan with a debtor, or a successor to the debtor under the plan, (ii) that the appointment or continuance of such individuals be consistent with the interests of creditors and equity security holders and with public policy, and (iii) that there be disclosure of the identity and nature of the compensation of any insiders to be retained or employed by the reorganized debtors.  *See* 11 U.S.C. § 1129(a)(5).

65.     The Plan provides for the automatic termination, on the Effective Date, of each Debtor's existing directors, officers, and managers, without the need for any Corporate Action.  *See* Plan § 5.2.1.  Additionally, the Debtors have disclosed, in the Plan itself and the Plan Supplement, that (i) Frederick Chin will serve as the initial Wind-Down CEO and will be

compensated in the manner set forth in and consistent with the Plan Supplement and (ii) Michael
Goldberg will serve as the initial Liquidation Trustee and will be compensated in the manner set
forth in and consistent with the Liquidation Trust Agreement.  The appointment of these
individuals is consistent with the interests of the Debtors' creditors and public policy, including
because they were selected as consensus candidates by the three official Committees.

Accordingly, the requirements of section 1129(a)(5) of the Bankruptcy Code have been satisfied.

## VI.     Section 1129(a)(6): The Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission

66.     Section 1129(a)(6) of the Bankruptcy Code requires that any governmental
regulatory commission having jurisdiction over the rates charged by the debtor in the operation
of its business approve any rate change provided for in a chapter 11 plan.  *See* 11 U.S.C.
§ 1129(a)(6).  The Plan does not provide for the change of any rate that is within the jurisdiction
of any governmental regulatory commission after the occurrence of the Effective Date.
Therefore, section 1129(a)(6) is inapplicable.

## VII.    Section 1129(a)(7): The Plan Is in the Best Interest of Creditors

67.     Section 1129(a)(7) of the Bankruptcy Code requires that holders of impaired
claims or interests which do not vote to accept the chapter 11 plan at issue "receive or retain
under the plan on account of such claim or interest property of a value, as of the effective date of
the plan, that is not less than the amount that such holder would so receive or retain if the debtor
were liquidated under chapter 7 of [the Bankruptcy Code] on such date."  11 U.S.C.
§ 1129(a)(7)(A)(ii).  Section 1129(a)(7) of the Bankruptcy Code is often referred to as the "best
interests test."  This test focuses on individual creditors' claims rather than on classes of
claims.[25]  Thus, through the "best interest of creditors" test of section 1129(a)(7), the Bankruptcy

---

[25]     *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).

Code protects non-consenting members of impaired classes by ensuring that each dissenting member of the impaired class receives at least what the dissenting member would receive if the debtor were instead liquidated under chapter 7 of the Bankruptcy Code. For the reasons set forth below, the best interests test is satisfied as to each Holder of an Impaired Claim or Equity Interest and no party in interest has argued otherwise.

68.     Significantly, the benefits of various Plan settlements are likely obtainable only under the Plan. The Plan embodies a comprehensive, extensively negotiated settlement and compromise of myriad novel and complex legal and factual issues, including, among other things, (i) whether the Notes are unsecured claims or are indirectly secured by valid, perfected security interests in property of the Estates, (ii) whether the Units are debt or equity interests, (iii) whether any of the Debtors have valid or enforceable Intercompany Claims or Intercompany Liens against Estate Assets owned by other Debtors, and (iv) whether substantive consolidation of the Debtors' Estates is warranted under the circumstances. In the event of conversion, the chapter 7 trustee, Noteholders, Unitholders, and Holders of General Unsecured Claims would have to confront the pursuit of extensive litigation to resolve all of these and other issues, or would need to try to negotiate an alternative settlement, all without the benefit of official committee representation for Creditors or the tools uniquely available under chapter 11 of the Bankruptcy Code to help implement and operationalize any settlement that is reached. Even if it led to the same ultimate result, this process would be extremely time-consuming and costly, and would reduce and delay any recoveries available for Creditors of the Estates.

69.     In addition, a chapter 7 trustee might decide instead to conduct an immediate sale of the Wind-Down Assets, including because (i) a chapter 7 trustee probably might not have adequate staffing or funding to dispose of the Debtors' real property over an extended period of

time, and (ii) a chapter 7 trustee would need to seek authorization to operate the Debtors'

remaining business, which is relief that should be granted only "for a limited period" in any

event. *See* 11 U.S.C. § 721. In light of, among other things, the limited universe of potential

buyers for luxury high-end residential properties, such a forced sale by a chapter 7 trustee would

likely ultimately result in significantly lower recoveries from the sale of the Wind-Down Assets,

as set forth in the liquidation analysis attached as Exhibit B to the Disclosure Statement (the

"Liquidation Analysis").

70.     Among other things, the Liquidation Analysis shows that even in the "High Case"

scenario analysis for the Holders of Standard Note Claims and Unit Claims, as applicable (which

analysis makes the most favorable possible assumptions regarding the outcome that could be

obtained by the subject constituency through litigation), the estimated recovery on such Claims is

greater under the Plan than in a chapter 7 liquidation scenario. The Liquidation Analysis was

prepared in good faith with regard to a hypothetical chapter 7 liquidation analysis and continues

to reflect the Debtors' best estimate of projected recoveries under the scenarios set forth therein

based on currently available information. *See* Sharp Decl. ¶¶ 36-37.

71.     Finally, conversion to chapter 7 of the Bankruptcy Code would also mean the

establishment of a new claims bar date, which could result in new General Unsecured Claims

being asserted against the Estates, thereby potentially diluting the recoveries of other Holders of

Allowed General Unsecured Claims. Conversion to chapter 7 could also create various asset and

liability allocation and intercompany reconciliation issues, which would ultimately adversely

affect the net proceeds available for distribution to creditors in those converted cases.

72.     On balance, a chapter 7 trustee would be less likely to maximize the value

ultimately available from all the Estate Assets and would be unable to obtain the full benefits of

many or perhaps even any of the compromises and settlements available under the Plan.
Therefore, confirmation of the Plan will provide each Holder of a Standard Note Claim, a
General Unsecured Claim, a Unit Claim, or a Non-Debtor Loan Note Claim with an equal or
greater recovery than such Holder would receive pursuant to the liquidation of the Debtors under
chapter 7 of the Bankruptcy Code.  *See* Sharp Decl. ¶ 39.  Accordingly, the requirements of
section 1129(a)(7) of the Bankruptcy Code have been satisfied.

**VIII.   Section 1129(a)(8): The Plan Complies with Section 1129(a)(8) of the Bankruptcy
Code, with the Exception of Classes 6, 7, and 8**

73.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired
claims or interests accepts the plan.  11 U.S.C. § 1129(a)(8) ("With respect to each class of
claims or interests – (A) such class has accepted the plan; or (B) such class is not impaired under
the plan.").

74.     As set forth above, Holders of Claims in Classes 1 and 2 are left Unimpaired
under the Plan and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively
presumed to have voted to accept the Plan.  Accordingly, the requirements of section 1129(a)(8)
have been satisfied as to each of these Unimpaired Classes.

75.     As set forth above, and as reflected in the Voting Certification, the Plan has been
accepted by Holders of Claims in Impaired Classes 3, 4, and 5 holding in excess of two-thirds in
amount and one-half in number.  Specifically, as indicated in the Voting Certification, (i) Class 3
voted to accept the Plan by 94.83% in amount and 95.13% in number, (ii) Class 4 voted to accept
the Plan by 99.84% in amount and 97.44% in number, and (iii) Class 5 voted to accept the Plan
by 96.76% in amount and 97.00% in number.  Accordingly, as to these Impaired and accepting
Classes, the requirements of section 1129(a)(8) likewise have been satisfied.

76.     After removing the 39 Holders of Non-Debtor Loan Note Claims who were

originally in Class 6 but who voted to accept the Plan and chose to opt-in to Class 3, Class 6 has

narrowly voted to reject the Plan.  Holders of Claims in Class 7 (Subordinated Claims) and

Holders of Equity Interests in Class 8 (Equity Interests) are not entitled to receive or retain any

property under the Plan on account of their Claims and Equity Interests (except, in the case of

Class 7, the theoretical but very unlikely possibility of some eventual recovery after the complete

satisfaction of all senior payment rights within the Liquidation Trust Interests Waterfall) and,

therefore, are deemed not to have accepted the Plan pursuant to section 1126(g) of the

Bankruptcy Code.  *See* 11 U.S.C. § 1126(g).  The Plan nonetheless may be confirmed under the

"cram down" provisions of section 1129(b) of the Bankruptcy Code, as discussed below in Part

XIV of this Memorandum.

## IX.     Section 1129(a)(9): The Plan Provides for Payment in Full of All Allowed Administrative Claims, Professional Fee Claims, Priority Tax Claims, and Priority Claims

77.     Section 1129(a)(9) of the Bankruptcy Code requires that entities holding allowed

claims entitled to priority under section 507(a)(1)–(8) of the Bankruptcy Code receive specified

cash payments under a plan.  Unless the holder of a particular claim agrees to a different

treatment with respect to such claim, section 1129(a)(9) requires a plan to provide as follows:

(A)     with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of [the Bankruptcy Code], on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B)     with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of [the Bankruptcy Code], each holder of a claim of such class will receive –

(i)     if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii)    if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

(C)    with respect to a claim of a kind specified in section 507(a)(8) of [the Bankruptcy Code], the holder of such claim will receive on account of such claim regular installment payments in cash –

(i)    of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii)    over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(iii)    in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

(D)    with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

11 U.S.C. § 1129(a)(9).

78.    Here, the Plan provides the treatment required by section 1129(a)(9) for each of the various Claims specified in sections 507(a)(1)–(8) of the Bankruptcy Code.  Specifically, (i) Section 3.1.1 of the Plan provide that, unless otherwise agreed, each Holder of an Allowed Administrative Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Claim; (ii) Section 3.1.3 of the Plan provides that, unless otherwise agreed, each Holder of an Allowed Priority Tax Claim will receive, at the Plan Administrator's option, either: (a) Cash equal to the unpaid portion of such Allowed Priority Tax Claim on the later of the Effective Date and thirty (30) calendar days following the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim; or (b) regular installment payments in Cash over a

period not exceeding five (5) years after the Petition Date, plus interest on the unpaid portion

thereof at the rate determined under applicable nonbankruptcy law as of the calendar month in

which the Effective Date occurs; (iii) Section 3.3 of the Plan provides that, unless otherwise

agreed, each Holder of an Allowed Priority Claim will receive Cash from the Liquidation Trust

equal to the unpaid portion of such Allowed Priority Claim as soon as reasonably practicable

after the later of (a) the Effective Date and (b) the date on which such Priority Claim becomes

payable pursuant to and as specified by an order of the Bankruptcy Court; and (iv) Section 11.2

of the Plan provides that all Professional Fee Claims shall be paid by the Liquidation Trust to the

extent approved by order of the Bankruptcy Court within five (5) Business Days after entry of

such order.  Accordingly, the requirements of section 1129(a)(9) of the Bankruptcy Code have

been satisfied.

## X.     Section 1129(a)(10): At Least One Class of Impaired Claims Has Accepted the Plan

79.     Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance

of the Plan by at least one class of impaired claims, "determined without including any

acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  The term "insider" includes

(i) entities that own 20 percent or more of the outstanding voting securities of the debtor;

(ii) directors of the debtor; (iii) officers of the debtor; (iv) persons in control of the debtor; (v) a

partnership in which the debtor is a general partner; (vi) a general partner of the debtor; or (vii) a

relative of a general partner, director, officer, or person in control of the debtor.  As set forth

above and in the Voting Certification, Classes 3, 4, and 5 are Impaired Class of Claims that voted

to accept the Plan, determined without including any acceptance of the Plan by any insider.

Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code has been satisfied.

80.     When analyzed on an entity-by-entity basis, the relevant Holders of Standard

Note Claims and Unit Claims have voted to accept the Plan at each of the applicable different

Fund Debtors,[26] thereby providing an impaired accepting class of Claims at each of those

Debtors.  With respect to the Other Debtors, when analyzed on an entity-by-entity basis, each

class of Claims at every Other Debtor with Creditors who actually voted on the Plan voted to

accept the Plan.  There are some Other Debtors with no creditors who voted on the Plan at all.

Nevertheless, under the substantive consolidation proposed in the Plan—and independently

sought in the unopposed Plan Settlements Motion—all Other Debtors will be consolidated into

WGC and that consolidated entity will have an impaired accepting class of Claims (Class 4).

Accordingly, when analyzed on a debtor-by-debtor basis, section 1129(a)(10) has been satisfied.

## XI.    Section 1129(a)(11): Feasibility

81.    Section 1129(a)(11) of the Bankruptcy Code requires that:

> [c]onfirmation of the plan is not likely to be followed by the
> liquidation, or the need for further financial reorganization, of the
> debtor or any successor to the debtor under the plan, unless such
> liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

82.    Here, the Plan specifically proposes a liquidation and eventual dissolution of each

of the Debtors.  Moreover, the Debtors believe the Debtors' current Cash and additional proceeds

to be generated from the Wind-Down Assets and the Liquidation Trust Assets will be sufficient

to allow the Wind-Down Entity or the Liquidation Trust, as applicable, to make all payments

required to be made under the Plan, including (i) paying in full all Allowed Administrative

Claims, DIP Claims, Professional Fee Claims, Priority Tax Claims, Other Secured Claims, and

Priority Claims as required by the Plan; and (ii) allowing for periodic payments to holders of

---

[26]    There is one entity—Woodbridge Commercial Bridge Loan Fund 2, LLC—that is included within the Fund
Debtors definition but has no Creditors that fall within Class 3, 4, 5, or 6.  *See generally* Docket No. 1273
(schedules for this entity).  Because it has no Creditors within any impaired class, no ballots were distributed
(or, in turn, returned) with respect to this entity.  This creates no issue under section 1129(a)(10), however,
because that section by its terms applies only "[i]f a class of claims is impaired under the plan" and there are no
impaired Creditors that would trigger application of section 1129(a)(10) to this entity as part of a debtor-by-
debtor analysis.

Allowed Class 3, Class 4, and Class 5 Claims (none of which are guaranteed a particular recovery under the Plan, including due to the risk factors detailed in the Disclosure Statement) consistent with the Plan. *See* Sharp Decl. ¶ 40; Chin Decl. ¶¶ 7-9. Accordingly, the Plan is feasible as proposed and the requirement of section 1129(a)(11) of the Bankruptcy Code has been satisfied.

## XII.   Section 1129(a)(12): All Statutory Fees Have Been or Will Be Paid

83.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the Plan." 11 U.S.C. § 1129(a)(12). In accordance with section 1129(a)(12), Section 11.3 of the Plan provides that all fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid on or before the Effective Date. *See* Plan § 11.3. Section 11.3 of the Plan further sets forth the details for quantifying the additional fees that will be paid after the Effective Date. Accordingly, the Plan satisfies section 1129(a)(12) of the Bankruptcy Code.

## XIII.   Sections 1129(a)(13) Through 1129(a)(16) Do Not Apply to the Plan

84.    Sections 1129(a)(13)–(16) of the Bankruptcy Code are inapplicable to the Debtors and the Plan, as the Debtors (i) do not provide "retiree benefits" as defined in section 1114 of the Bankruptcy Code (*see* 11 U.S.C. § 1129(a)(13)), (ii) have no domestic support obligations (*see* 11 U.S.C. § 1129(a)(14)), (iii) are not individuals (*see* 11 U.S.C. § 1129(a)(15)), and (iv) are not nonprofit corporations (*see* 11 U.S.C. § 1129(a)(16)). *See* Sharp Decl. ¶ 43.

## XIV. The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code

85.     Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a chapter 11 plan in circumstances when not all impaired classes of claims and equity interests vote to accept that plan.  This mechanism is known colloquially as "cram down."

86.     Specifically, section 1129(b)(1) provides, in pertinent part, that:

> [I]f all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).

87.     Thus, under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may "cram down" a plan as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to unimpaired classes that did not vote to accept the plan.[27]

88.     Here, as noted above, Class 6 (Non-Debtor Loan Note Claims), Class 7 (Subordinated Claims), and Class 8 (Equity Interests) (collectively, the "Rejecting Classes") have voted to reject the Plan or are deemed to reject the Plan.  Accordingly, the Debtors invoke section 1129(b) to "cram down" the Plan with respect to the Rejecting Classes.

### A.     The Plan Does Not Discriminate Unfairly

89.     The unfair discrimination standard of section 1129(b) of the Bankruptcy Code requires that a chapter 11 plan does not unfairly discriminate against a dissenting class with respect to the value it will receive under a plan when compared to the value given to all other

---

[27]     *See, e.g.*, *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005); *In re Dura Auto. Sys., Inc.*, 379 B.R. 257, 271-72 (Bankr. D. Del. 2007); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (D. Del. 2003).

similarly-situated classes.[28]  Generally a plan unfairly discriminates in violation of section

1129(b) of the Bankruptcy Code only if similar classes are treated differently without a

reasonable basis for the disparate treatment.[29]  Accordingly, as between two classes of claims or

two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of

dissimilar claims or interests,[30] or (ii) taking into account the particular facts and circumstances

of the case, there is a reasonable basis for such disparate treatment.[31]

90.    Here, the Plan does not "discriminate unfairly" with respect to the Rejecting

Classes as there are no similarly-situated Classes receiving more favorable treatment.  With

respect to Class 6, the Plan's treatment contemplates that each Holder of a Non-Debtor Loan

Note Claim will litigate whether its Claim is secured or unsecured.  If the Court determines any

such Claim is secured, the Holder of such Claim will receive a treatment that reflects its unique

collateral.  If (as the Debtors believe will be the case) the Court determines any such Claim is

unsecured, the Holder of such Claim will be reclassified in and receive the same treatment as the

Holders of Class 3 Standard Note Claims, which at that point is fully appropriate and consistent

with equal treatment of all similarly-situated Note Claims.  The Plan's treatment of Holders of

Claims in Class 7 (Subordinated Claims) is based on the statutory mandates of section 510 of the

Bankruptcy Code.  *See* 11 U.S.C. § 510.  Indeed, in order to comply with section 1129(a)(1) of

the Bankruptcy Code, which requires that a chapter 11 plan comply with applicable provisions of

---

[28]    *See, e.g.*, *In re Barney & Carey Co.*, 170 B.R. 17, 25 (Bankr. D. Mass. 1994).

[29]    *See, e.g.*, *In re Rubicon U.S. REIT, Inc.*, 434 B.R. 168, 175 (Bankr. D. Del. 2010) (noting that courts generally look to whether "[v]alid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan"); *In re Lernout*, 301 B.R. at 660 ("The hallmarks of the various [unfair discrimination] tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination").

[30]    *See, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, *In re Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[31]    *See, e.g.*, *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990).

the Bankruptcy Code, section 510 must be enforced.  Likewise, the Plan's treatment of Holders

of Equity Interests in Class 8 (Equity Interests) is based on the priorities of the Bankruptcy Code

and applicable corporate law.  Thus, the Plan does not "discriminate unfairly" with respect to any

impaired Classes of Claims or Equity Interests under the Plan that did not accept the Plan.

### B.    The Plan Is Fair and Equitable

91.    Section 1129(b)(2) defines the phrase "fair and equitable" as to impaired classes

of secured creditors, unsecured creditors, and equity interest holders as follows:

> As to secured creditors: Either: (i) the secured creditor retains its lien and receives
> deferred cash payments totaling at least the allowed amount of such claim, of a value, as
> of the effective date of the plan, of at least the value of such holder's interest in the
> estate's interest in such property; (ii) the underlying collateral is sold with the secured
> creditor's liens to attach to the proceeds of such sale; or (iii) the secured creditor will
> realize the "indubitable equivalent" of its secured claim.

> As to unsecured creditors: Either (i) each impaired unsecured creditor receives or retains
> under the plan property of a value, as of the effective date of the plan, equal to the
> amount of its allowed claim, or (ii) the holders of claims and interests that are junior will
> not receive or retain any property under the plan on account of their claims or interests.

> As to equity interest holders: Either (i) each holder of an interest will receive or retain
> under the plan property of a value, as of the effective date of the plan, equal to the
> greatest of any fixed liquidation preference to which such holder is entitled, any fixed
> redemption price to which such holder is entitled, or the value of the interest, or (ii) the
> holder of any interest that is junior to the non-accepting class will not receive or retain
> any property under the plan on account of their its interest.

11 U.S.C. § 1129(b)(2)(A)–(C).[32]  These provisions, *inter alia*, codify the so-called "absolute

priority rule," which mandates that if the holders of claims in a particular class receive less than

full value for their claims, no holders of claims or interest in a junior class may receive or retain

---

[32]    *See also 203 N. LaSalle*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a
plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full,
§ 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such
[impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest
any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority
rule.'").

any property under the plan.  The corollary to the absolute priority rule is that no senior classes

may receive greater than a 100% recovery on their claims.

92.     In the instant case, the "fair and equitable" requirement is satisfied as to the

Rejecting Classes.  With respect to Class 6, the Plan provides a bifurcated treatment based on

whether any given Holder of a Non-Debtor Loan Note Claim is ultimately found to be a secured

or unsecured creditor.  If the former determination is made, then "such Holder will receive on or

as soon as is reasonably practicable after the date of such determination Cash from the

Liquidation Trust in the amount of such Holder's Allowed Class 6 Claim to the extent such

Allowed Claim is a Secured Claim, with post-Confirmation interest thereon at the applicable

contract rate."  Plan § 3.7.  This cash payment accordingly provides the Holder with the

"indubitable equivalent" of its secured claim, which is an appropriate "cram down" treatment.[33]

Alternatively, if the latter determination is made, then "such Claim shall automatically be

reclassified as a Class 3 Claim and such Claim will be treated as if such Claim had always been

part of Class 3 and based on the Outstanding Principal Amounts and Prepetition Distributions

that are determined by the Bankruptcy Court regarding such Noteholder."  *Id.*  In this scenario,

the applicable claimant would be reclassified into a class that has overwhelmingly voted to

accept the Plan (just like the 39 Holders of Non-Debtor Loan Note Claims who affirmatively

chose to opt-in to Class 3), thereby eliminating the need for any "cram down" treatment.  Put

differently, a particular Creditor remaining in Class 6 either is secured, in which case it will

---

[33]     *See, e.g.*, *In re Bryant*, 439 B.R. 724, 747 (Bankr. E.D. Ark. 2010) (noting how "[c]ourts interpreting the indubitable equivalence standard have found cash payments, replacement collateral, abandonment of collateral, and combinations thereof, to be the indubitable equivalent of a secured claim" and collecting numerous cases); *In re Temple Zion*, 125 B.R. 910, 922 (Bankr. E.D. Pa. 1991) ("[A]ll that is required by § 1129(b)(2)(A)(iii) is that the creditor receive the indubitable equivalent of its claim.  A cash payment of its claim in full is unquestionably the equivalent or better of [a creditor's] retention of the full measure of its security interest in the Debtor's realty."); *In re Griffiths*, 27 B.R. 873, 876 (Bankr. D. Kan. 1983) ("Indubitable equivalent cash payments must equal at least the secured claim.").

receive a treatment that permits it to be crammed down, or is unsecured, in which case it will be reclassified into Class 3 (which accepted the Plan). In either scenario, the Plan appropriately can be confirmed despite the fact that the Holders of Non-Debtor Loan Note Claims who elected to remain in Class 6 did not vote to accept the Plan by the necessary margins.

93.     With respect to Classes 7 and 8, (i) no Claims or Equity Interests junior to either Class will receive or retain any property under the Plan on account of such junior Claims or Equity Interests and (ii) no Holder of a Claim senior to Class 7 or Class 8 will receive more than payment in full on account of its Claim. Thus, the Plan is "fair and equitable" with respect to all Impaired Classes of Claims or Equity Interests under the Plan that did not accept the Plan.

## XV.   The Plan Satisfies the Requirements of Section 1129(c), (d), and (e) of the Bankruptcy Code

94.     The Plan is the only plan on file in the Chapter 11 Cases and, as such, section 1129(c) of the Bankruptcy Code is satisfied. The "principal purpose of the Plan is [not] the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933," *see* Sharp Decl. ¶ 44, and no party in interest has alleged otherwise. Accordingly, section 1129(d) of the Bankruptcy Code is inapplicable. Finally, these Chapter 11 Cases are not "small business cases" and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

## XVI.   Responses to the Sarachek Group Objection

95.     The Sarachek Group Objection is an unfocused document setting forth a shotgun blast of complaints about the Plan, albeit not in a structured or clearly delineated manner. The objection appears to raise six different issues, which are addressed in turn below.

96.     Before addressing the specific issues, it is important to emphasize two threshold points. ***First***, the Sarachek Parties are holders of Notes and Units who are Creditors of only the seven Fund Debtors. None of the Sarachek Parties are Creditors of the Other Debtors. As a

result, the Sarachek Parties lack standing to complain about any issues that impact only classes

of creditors that do not include them, including substantive consolidation of the Other Debtors

into WGC or anything else relating to Class 4.[34]  ***Second***, with the narrow exception of Class 6,

the classes in which the Sarachek Parties hold Note Claims and Unit Claims have voted by

massive margins to accept the Plan.  It is black-letter bankruptcy law that dissenting creditors

within an accepting class are bound to the claim treatment to which the necessary majority (and

here, the acceptances are by far more than the necessary majority) of that class has consented.[35]

Indeed, the necessary votes will bind dissenters not only to claim treatment, but also to any other

appropriate provisions to which the majority has consented.[36]

---

[34]  *See, e.g.*, *In re Tascosa Petroleum Corp.*, 196 B.R. 856, 863–64 (D. Kan. 1996) (finding that creditor lacked standing to object to confirmation of portions of chapter 11 plan that did not affect its direct interests or to assert rights of other creditors); *In re W.R. Grace & Co.*, 446 B.R. 96, 110 (Bankr. D. Del. 2011) ("AMH is a property damage claimant, not a Class 6 claimant, and so has no standing to object on the basis of the treatment of Class 6 claimants, who have voted overwhelmingly to accept the plan."); *Delp v. HBF Fin., Ltd. (In re Delp)*, 2001 Bankr. LEXIS 2235, at *46 (Bankr. N.D. Tex. Sept. 27, 2001) (noting how "[c]ourts have repeatedly held that parties have standing only to challenge those parts of a reorganization plan that affect their direct interest" and citing numerous supporting authorities (internal quotation marks omitted)).

[35]  *See, e.g.*, *Lenders Prot. Grp. v. USA Commer. Mortg. Co. (In re USA Commer. Mortg. Co.)*, 2007 U.S. Dist. LEXIS 65264, at *41 (D. Nev. Aug. 29, 2007) ("It is the class vote to accept the plan that binds even non-consenting creditors to claim treatment."); *In re White Farm Equip. Co.*, 38 B.R. 718, 724 (N.D. Ohio 1984) (explaining how objecting "claimants were bound by their fellow Class 8 members' acceptance"); *In re Charterhouse, Inc.*, 84 B.R. 147, 153 (Bankr. D. Minn. 1988) ("Inherent in the concept of acceptance under 11 U.S.C. § 1126(c) and (d) is the principle by which a majority of the members of the class could bind a minority.  Thus, if the requisite majorities within the bondholders' class accepted the modification, a dissident minority could be bound and would then not be entitled to receive its second distribution, so long as the proposed treatment for each class member met the equality requirement of 11 U.S.C. § 1123(a)(4)." (citation omitted)); Douglas G. Baird & Robert K. Rasmussen, *The End of Bankruptcy*, 55 STAN. L. REV. 751, 787–88 (2002).

[36]  *See, e.g.*, *In re Residential Capital, LLC*, 497 B.R. 720, 747–49 (Bankr. S.D.N.Y. 2013); *In re Delta Air Lines, Inc.*, 370 B.R. 537, 541-42 & 549–50 (Bankr. S.D.N.Y. 2007).  Of course, this principle does have some limits. Dissenting creditors remain protected by the requirement of Bankruptcy Code section 1123(a)(4) that a plan provide "the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment" as well as by the "best interests" test under section 1129(a)(7).  The Sarachek Parties advance no argument based on either section.  Nor could they; every member of the relevant classes will receive identical treatment under the Plan in accordance with section 1123(a)(4) and the record readily satisfies the "best interests" test (*see* Part VII of this Memorandum, *supra*).

### A.    The "Secured Creditor" Litigation Theory

97.    The first argument is that the Plan does not provide a payment mechanism if the Sarachek Parties prevail on their litigation theory that they are secured creditors.  *See* Sarachek Group Obj. ¶¶ 1-5.[37]  But the Court has already held that the Sarachek Parties will ***not*** prevail on these theories, including for the reasons detailed in the Court's 20-page Opinion issued on October 5, 2018, and the Plan will separately moot many of the theories in any event.

98.    The Sarachek Group Objection provides no analysis of any asserted defects in the Court's ruling nor any explanation of why there is a material—or any—probability of reversal of that decision on appeal.  Instead, the objection simply notes that an appeal was filed.

99.    Case law makes clear that, when a claim has been disallowed or rejected by the bankruptcy court, a plan may properly provide for a $0 reserve or otherwise give full effect to the bankruptcy court's prior decision despite the pendency of an appeal by the losing creditor.[38]  The decision in *In re Johnson*, 2016 Bankr. LEXIS 4598 (S.D. Ohio Nov. 10, 2016), is on point.  In *Johnson*, a creditor known as RFF asserted it was secured by liens on certain assets of the debtor.

---

[37]    The objection is ambiguous about exactly which of their assorted theories the Sarachek Parties believe will be "prevail[ing] in their litigation."  To the extent these creditors can establish final allowable, non-subordinated claims in a Plan Class (despite, among other things, the failure to file timely proofs of claims and the lack of any excusable neglect, particularly for a self-styled 30+ year veteran of the bankruptcy field), the Plan has "a payment mechanism" for any such claims through the issuance of additional Liquidation Trust Interests.  The Debtors are confident no such claims will be allowed.  In any event, at this point, any such claims are purely speculative as there are no proofs of claim on file and no pending motion to allow the filing of otherwise time-bared claims (which motion would be strongly opposed).

[38]    *See, e.g.*, *In re Wash. Mut., Inc.*, 2012 U.S. Dist. LEXIS 51184, at *3 n.3 (D. Del. Jan. 19, 2012) (explaining that a bankruptcy court retains jurisdiction and power to consider confirmation of a chapter 11 plan predicated in part on the correctness of a prior bankruptcy court order "notwithstanding the pendency of an appeal from" the prior order); *In re Oakwood Homes Corp.*, 329 B.R. 19, 22 (D. Del. 2005) (affirming bankruptcy court order setting the plan reserve amount for a claim at zero, even though the claim was on appeal); *In re MCorp Fin, Inc.*, 160 B.R. 941, 962–63 (S.D. Tex. 1993) ("A contingent claim does not remain at its original pleaded value until a final, non-appealable order is entered.  Once an adjudication at the trial level has been made, the claim is no longer contingent; it is allowed to some extent or disallowed.  To hold otherwise would mean that no bankruptcy estate could ever make a distribution without every disputed claim, no matter how frivolous or how unseasonably brought, having been fully litigated through the trial court and three appellate levels.  This is not the system that congress created."); *In re Enron Corp.*, 2006 Bankr. LEXIS 4294 (Bankr. S.D.N.Y. Jan. 17, 2006) (granting debtor's motion to establish plan reserve of $0 for claim that bankruptcy court had previously disallowed despite pending appeal of that disallowance).

The bankruptcy court rejected this theory and held that RFF did not have a security interest in the property.  *See Johnson v. RFF Family P'ship, LP (In re Johnson)*, 554 B.R. 448 (Bankr. S.D. Ohio 2016), *aff'd*, 2017 Bankr. LEXIS 1480 (B.A.P. 6th Cir. June 2, 2017).  RFF appealed and objected to confirmation of the debtor's plan on the ground that it did not provide an appropriate treatment for the asserted secured claim.  *See* 2016 Bankr. LEXIS 4598, at *33.  Bankruptcy Judge Hoffman overruled this objection on the basis that he had already "held that RFF's claim is not secured," and thus "there is no need for a reserve to be set aside for RFF based on its contention that its claim is secured."  *Id.* at *33–34.  The pending appeal (which RFF ultimately lost) provided no reason to disturb the bankruptcy court's ruling and did not require the debtor's plan to be revised to accommodate scenarios where the bankruptcy court might be reversed.  *See id.* at *34–35.  As in *Johnson*, the Debtors are unaware of any, and the Sarachek Parties articulate no, "reason why [this Court's] ruling will be disturbed on appeal."  *Id.* at *33.

100.    In addition, even if the Court's ruling is ultimately incorrect in some respects such that the applicable Noteholders are actually validly perfected in the intercompany notes and deeds of trust (which the Debtors strongly dispute), that dispute would be mooted under the Plan, which provides as one element that any Intercompany Claims that could be asserted by one Debtor against another Debtor will be extinguished with no separate recovery on account of any such Claims and any Intercompany Liens that could be asserted by one Debtor regarding any Estate Assets owned by another Debtor will be deemed released and discharged (subject to certain rights being preserved as against any junior lienholders).  *See* Plan § 3.11.2(g).  If the Plan is confirmed (which it should be, especially in light of the voting results and acceptance by every class of impaired claims affected by its proposed settlements and the reasonableness of the settlement, *see generally* Part XVI.D of this Memorandum, *infra*), then it is simply and forever

*irrelevant* whether any Noteholder has a perfected, enforceable security interest in the intercompany rights. ***If the purported Noteholder collateral is invalid, void, or otherwise unenforceable, then it becomes purely academic whether the Noteholder has a security interest in such an invalid, void, or unenforceable item.*** There is no reason why the Plan must be revised to accommodate concepts that are antithetical to cornerstones of the Plan—cornerstones that the Creditors in these Chapter 11 Cases have accepted with enthusiasm.

101.    In sum, the Sarachek Parties have not prevailed (and will never prevail) in their litigation; they litigated and have lost before this Court. Although those parties have appealed, they offer no demonstration that they have a substantial (or any) likelihood of success on appeal. The Plan now before the Court is fully consistent with the Court's thoughtful written decision, and the pendency of an appeal premised on some inconsistent theory (much of which would be mooted by the Plan's terms in any event) provides no basis to deny confirmation or require any modification of the Plan.

### B.    Was There a Ponzi Scheme?

102.    The second argument is that "[t]he Debtors scream 'Ponzi, ponzi, ponzi,' but have not released a detailed record of this fact." Sarachek Group Obj. ¶ 6; *see also id.* ¶¶ 7-8 & 10. As an initial matter, the Sarachek Group Objection is simply wrong. Extensive evidence of a Ponzi scheme was provided early in the Chapter 11 Cases, including (i) a declaration, dated as of December 18, 2017 (the "2017 Kapila Declaration") that was prepared by Soneet R. Kapila and filed by the SEC on December 26, 2017 as Docket No. 36-2 in the SEC Litigation, and admitted into evidence without objection at the January 10, 2018, hearing in these cases (*see* Jan. 10, 2018 Hr'g Tr. at 18:21); and (ii) testimony at that same hearing by Mr. Kapila's colleague, Amanda Melissa Davis, regarding the 2017 Kapila Declaration (*id.* at 245:25-280:7). In addition, evidence establishing a Ponzi scheme is being submitted herewith, and that evidence

43

demonstrates there was a Ponzi scheme.  *See* Part I.C.(f)(ii) of this Memorandum, *supra*.  The

conclusions of the Debtors' advisors regarding this issue fit with those reached by the Securities

and Exchange Commission in connection with the SEC Action and by each of the three

Committees.  The evidence manifestly, but unfortunately, shows that there was a Ponzi scheme.

     103.    The Sarachek Group Objection never ***denies*** there was a Ponzi scheme or

provides any evidence establishing that there was no Ponzi scheme.  In fact, Mr. Sarachek

himself has affirmatively alleged the functional equivalent of a Ponzi scheme.  More specifically,

on October 4, 2018, various of Mr. Sarachek's clients filed a *Complaint for Declaratory*

*Judgement* [sic]*, Consumer Fraud, and Elderly Abuse* (the "<u>Abbott Complaint</u>"), thereby

commencing *Abbott, et al. v. Woodbridge Group of Companies, LLC, et al. (In re Woodbridge*

*Group of Companies, LLC)*, Adv. Proc. No. 18-50880 (KJC) (Bankr. D. Del.).  Among the

allegations made in the Abbott Complaint are the following:

- "Robert Shapiro ('Shapiro') used a network of over 275 Limited Liability
  Companies to carry out a complex scheme and unlawfully raise more than $750
  million from over 9,000 investors nationwide, many of whom were 65 years of
  age or older."  ¶ 1.

- "After receiving over $750 million of investors' funds, the third-party borrowers
  generated only minimal interest income. Without any significant income to repay
  the investors, the Debtors took new investor funds to pay the interest owed to the
  existing investors."  ¶ 2.

- "Several of the LLCs had no revenue or bank accounts, but nonetheless issued
  promissory notes to one of the entities owned by Debtors. Although the shell
  LLCs had no ability to pay monthly interest or dividends, Debtors created

investment products to market the promissory notes secured by real property as 'smart' and 'protected' investments to consumers." ¶ 3.

- "Since Debtors' entities were not receiving any interest payments on the shell LLCs' promissory notes, Debtors used new investor funds to pay the interest and dividends owed to the previous investors. This created the appearance that Debtors were loaning the investors' funds to legitimate third-party borrowers who had the ability to pay and did pay monthly interest and dividend payments. . . . This allowed Debtors to convince new investors to participate in its investment products and induce existing investors to rollover their investment upon maturity into a new note, seemingly delaying Debtors' obligation to repay the principal balance to investors." ¶ 4.

- "Debtors were eventually unable to raise enough new money to pay the existing investors, and the entire organization collapsed, resulting in over $750 million owed to investors." ¶ 5.

104.    There is a name for what is alleged in the Abbott Complaint, which complaint was filed by counsel "certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the allegations and other factual contentions have evidentiary support." FED. R. BANKR. P. 9011(b)(3).  That name is a ***Ponzi scheme***.  The Court should not permit Mr. Sarachek to, on the one hand, affirmatively allege in the Abbott Complaint facts that would constitute a Ponzi scheme while, on the other hand, claiming that there is no proof of any such scheme.  In point of fact, the Abbott Complaint gets it (but basically nothing else) right—there was indeed a Ponzi scheme carried out by the

Debtors pre-bankruptcy.  That scheme is established by the record evidence and appropriately influences numerous aspects of the Plan.

### C.      The Propriety of Substantive Consolidation

105.      The third argument made by the Sarachek Parties is that the Plan's substantive consolidation framework is improper.  *See* Sarachek Group Obj. ¶¶ 6, 18-22.  This argument fails for several reasons.

106.      *First*, all of the classes affected by the Plan's proposed substantive consolidation have voted to accept the Plan and thereby consented to those aspects of the Plan.  More specifically, Classes 3, 4, and 5 voted to accept the Plan by overwhelming majorities.  Although Class 6 voted to reject the Plan, this poses no obstacle to substantive consolidation based on consent by affected creditors.  The reason why is that under Section 3.7 of the Plan, the remaining Class 6 Creditors will either (i) be found to be secured, in which case they will receive payment in full in cash on account of any allowed secured claim, and thereby be unaffected by any aspect of substantive consolidation, or (ii) be found to be unsecured, in which case they will be reclassified into Class 3 and be bound by the overwhelming acceptance of the Plan by Class 3.

107.      *Second*, as to the proposed consolidation of all Other Debtors into WGC, none of the Sarachek Parties hold Claims against any of these Debtors, and thus they have no basis to complain about the proposed consolidation.  In fact, every Creditor of the Other Debtors who voted on the Plan voted to accept the Plan and thereby consented to the proposed consolidation. In any event, the record makes clear that substantive consolidation of the Other Debtors into WGC is appropriate under the second prong of the test articulated in *In re Owens Corning*, 419 F.3d 195, 210–11 (3d Cir. 2005)—*i.e.*, the Other Debtors' "assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."  *See* Sharp Decl. ¶¶ 13-19; Plan Settlements Motion ¶¶ 50-59.

108.    The substantive consolidation proposed in the Plan should be approved for the reasons set forth in this Court's opinion in *In re Abeinsa Holding, Inc.*, 562 B.R. 265 (Bankr. D. Del. 2016).  In *Abeinsa Holding*, as here, the proposed consolidation was "supported by the *Owens Corning* principles."  *Id.* at 281.  Moreover, based on the plan votes, "the creditors overwhelmingly consent to the partial substantive consolidation of the Debtor groups" except for a few dissenting creditors.  *Id.* at 282.  Finally, "there is nothing in the record demonstrating that the partial substantive consolidation particularly harms any creditor or other stakeholder."  *Id.* at 282.  All these considerations apply with equal or greater force here.

109.    The decision in *Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576 (D. Del. 2009), is readily distinguishable.  In *New Century*, the objecting and appealing parties who opposed substantive consolidation were members of a class that had voted to ***reject*** the plan.  *See id.* at 585 ("Every class of creditors entitled to vote accepted the first amended plan except class HC3b, which includes appellants.").  As such, there was not the necessary consent by each class of creditors that would be adversely affected by consolidation.  *Cf. id.* at 591 (noting that in the Third Circuit, substantive consolidation is appropriate based on creditor consent).  Moreover, in *New Century*, "the record [did] not show that substantive consolidation [was] warranted in this case" under either of the *Owens Corning* factors (perhaps because the issue had initially been analyzed as if *Owens Corning* were inapplicable).  *See id.* at 592.  By contrast, here the record shows that substantive consolidation of WGC into the Other Debtors is warranted based on the second rationale in *Owens Corning* (in addition to creditor consent).  *New Century* is ultimately not an apt precedent regarding this case.

110.    In summary, the overwhelming acceptance of the Plan by every class affected by the Plan's substantive consolidation provides the necessary creditor consent.  At least as to all of

the Other Debtors, substantive consolidation into WGC is separately appropriate based on evidence satisfying the second rationale in *Owens Corning*.  As such, the Court should approve the proposed substantive consolidation for the same reasons the Court did so in *Abeinsa Holding*.

   **D.    Settlement of Hotly Contested Intercompany Liens**

   111.    The fourth argument is that the Plan seeks "to extinguish the valid, existing liens between various debtor entities," which supposedly is improper insofar as a plan cannot "avoid liens."  *See* Sarachek Group Obj. ¶¶ 12-13.  For multiple reasons, this is a remarkably distorted description of what is occurring under the Plan.

   112.    ***First***, the Intercompany Liens have not been shown to be "valid."  To the contrary, the Unsecured Creditors' Committee has commenced litigation that calls into question the validity of those liens in several respects, which litigation raises serious and complex issues. *See generally* Plan Settlements Motion ¶¶ 13-17.  The Sarachek Parties' naked labeling of these liens as "valid" is possible only if one remains deliberately ignorant of the key issues raised by the Unsecured Creditors' Committee (which were discussed in the associated standing motion and complaint, as well as in the Disclosure Statement provided to all creditors, as well as in the unopposed Plan Settlements Motion).

   113.    ***Second***, the Plan does not "avoid" any liens.  Rather, the Plan proposes a settlement and compromise that includes as one element a resolution of the attacks that have been raised about the validity of these Intercompany Liens.  *See* Plan § 3.11.2(g).  This proposed settlement is entirely appropriate.  The Intercompany Liens are assets of certain bankruptcy estates (*i.e.*, the Estates of the Fund Debtors) based on asserted but disputed claims against other bankruptcy estates (*i.e.*, the Estates of the applicable PropCos and MezzCos).  Chapter 11 plans regularly settle these sorts of disputed issues.  *See, e.g.*, *In re Exide Techs.*, 303 B.R. 48, 66–71 (Bankr. D. Del. 2003) (approving plan-based settlement of secured claim challenges that were

the subject of pending litigation by the creditors' committee).  And the settlement here satisfies

the applicable standards for approval.  *See* Plan Settlements Motion ¶¶ 32-49.  Indeed, the class

of Creditors most affected by this aspect of the Plan—Class 3 (Standard Note Claims)—has

voted overwhelmingly in favor of the proposed settlement and compromise under the Plan.

114.    Once the strawman argument about supposed "avoidance" of "valid" liens is put

to rest, it is apparent that there is nothing objectionable about this aspect of the Plan.  The Plan

proposes a reasonable compromise to resolve myriad disputes relating to potential Intercompany

Liens and Intercompany Claims.  That proposed compromise has been overwhelmingly accepted

by the creditors who would be affected by it.  The Sarachek Group Objection provides no

analysis to undermine the settlement and no basis to call into question the votes of thousands of

other creditors who disagree with the views of the Sarachek Parties by massive margins.

E.    **Section 1129(a)(10) Issues**

115.    The fifth argument, premised on this Court's decision in *In re Tribune Co*., 464

B.R. 126 (Bankr. D. Del. 2011), is that the Plan supposedly will violate Bankruptcy Code section

1129(a)(10) if there is not an impaired accepting class at each of the 306 Debtors.  *See* Sarachek

Group Obj. ¶¶ 14-17.  But *Tribune* is readily distinguishable and inapplicable here for several

reasons.

116.    ***First***, as to the entities against which the Sarachek Parties actually have claims

(certain Fund Debtors), this is a complete non-issue.  When analyzed on an entity-by-entity

basis, there is an impaired accepting class of Noteholders or Unitholders (or both) at every one of

the applicable Fund Debtors,[39] which satisfies section 1129(a)(10) as to those entities.

---

[39]    As discussed in footnote 26 above, there is one entity that is defined as a "Fund Debtor" and as to which no
votes were received.  Because that entity has no impaired Creditors, however, section 1129(a)(10) by its terms
is inapplicable to it.

117.     *Second*, as to every one of the Other Debtors with Creditors who voted on the Plan, all of the Creditors voted to accept the Plan, which satisfies section 1129(a)(10) as to those entities.  There is no Other Debtor with a rejecting claimant, let alone a rejecting class.

118.     *Third*, as to the Other Debtors that have Creditors who did not vote on the Plan at all, section 1129(a)(10) will be satisfied via the substantive consolidation proposed in the Plan— and independently sought separate from the Plan in the Plan Settlements Motion.  This is a key distinguishing factor from *Tribune*, which the Court noted repeatedly involved no substantive consolidation.  *See* 464 B.R. at 182 ("each of the proposed plans contains a provision expressly stating, in primary part, that the respective Debtors' estates are *not* being substantively consolidated" (citation omitted)) & *id.* ("Neither the DCL Plan nor the Noteholder Plan proposes substantive consolidation of the Debtors.").  Indeed, the rule articulated by the Court was that section 1129(a)(10), "*absent substantive consolidation* or consent, must be satisfied by each debtor in a joint plan."  *Id.* at 183 (emphasis added).  Here, of course, the Plan expressly and openly proposes substantive consolidation, which eliminates the need to satisfy section 1129(a)(10) as to every single Debtor.  To the extent the Court is at all hesitant to rely on the substantive consolidation proposed by the Plan to address this issue, it could grant the unopposed Plan Settlements Motion and approve substantive consolidation of the Other Debtors into WGC independent of the Plan.  The resulting consolidated Class 4 is an impaired consenting class that has overwhelmingly voted to accept the Plan, thereby (yet again) satisfying section 1129(a)(10).

### F.     Treatment of Noteholders Relative to Unitholders

119.     The final argument made by the Sarachek Parties is that "there is absolutely no justification for distinguishing between noteholders and unitholders as provided by the plan" and thus "one of the most absurd features of the Plan is that it treats noteholders and unitholders in a

disparate manner." *See* Sarachek Group Obj. ¶¶ 9 & 23.[40]  Once again, this attack is premised on

willful blindness of what has occurred in the Chapter 11 Cases and disregard of foundational

principles of bankruptcy law.

120.    ***First***, as detailed in the Disclosure Statement, there is a justification to distinguish

between Notes and Units based on potential arguments that could be made about whether the

Units are "debt" or "equity."  *See* Disclosure Statement § IV.B.2.  To be sure, the presence of a

Ponzi scheme is an ***argument*** that could be raised in favor of *pari passu* treatment of Note

Claims and Unit Claims that could be raised (and in fact was raised by the Unitholder Committee

during plan negotiations).  *See id.* (explaining that "the Unitholders could point to other cases

involving Ponzi schemes where all investors have been treated as similarly-situated victims,

albeit in contexts other than distributions under a chapter 11 plan").  It still is only an ***argument***,

however, and there are countervailing and offsetting arguments that can also be made, including

that nothing in the plain text of the Bankruptcy Code provides that the classification of a

particular instrument as debt or equity varies based on whether a given case involves a Ponzi

scheme.  The fact of the matter is that this is a highly-complex, uncertain issue that is

appropriately part of the Plan's interlocking settlements.  *See* Plan Settlements Motion ¶¶ 18-23;

Sharp Decl. ¶¶ 30-31.  The Sarachek Parties never argue that the Plan's compromised treatment

of Unit Claims relative to Note Claims is outside the acceptable range of reasonableness.  In

truth, the settlement factors are readily satisfied.  *See* Plan Settlements Motion ¶¶ 32-49.

121.    ***Second***, regardless of the Sarachek Parties' views, the classes affected by the

promised compromise have voiced their strong support.  Most notably, Class 5 (Unit Claims)

---

[40]    This argument highlights the deep conflicts of interests that Mr. Sarachek has created for himself.  By contending that Unitholders should receive treatment identical to Noteholders, Mr. Sarachek is advancing a position that is contrary to the interests of his clients who hold Notes but not Units—the position, if successful, would literally take money away from some of his clients and give it to other of his clients.  This situation is untenable.  *See generally Motion to Revoke Pro Hac Vice Admission of Joseph Sarachek* [Docket No. 2733].

Case 17-12307-BLS    Doc 2637    Filed 05/10/18    Page 64 of 65

voted to accept the Plan by a margin of 97.00% in number and 96.76% in amount.  The Sarachek

Parties are bound by the consent of the classes in which their Note Claims and Unit Claims are

included, *see* ¶ 96 and footnotes 35-36, *supra*, and thus have no legally cognizable cause to

complain about the relative treatment of Noteholders and Unitholders under the Plan.

*       *       *

122.    At day's end, all of the arguments made or suggested by the Sarachek Group

Objection are meritless.  Particularly in light of the voting results, the Plan satisfies every

applicable confirmation element.  The Court should overrule these deeply misplaced objections.

[<em>Remainder of Page Intentionally Left Blank</em>]

## CONCLUSION

The Plan complies with and satisfies all applicable requirements of section 1129 of the

Bankruptcy Code.  Therefore, the Debtors respectfully request that the Bankruptcy Court

(i) confirm the Plan and (ii) grant the Debtors such other and further relief as is just and proper.

Dated:    October 19, 2018                   */s/ Sean M. Beach*
          Wilmington, Delaware               YOUNG CONAWAY STARGATT & TAYLOR, LLP
                                             Sean M. Beach (No. 4070)
                                             Edmon L. Morton (No. 3856)
                                             Ian J. Bambrick (No. 5455)
                                             Betsy L. Feldman (No. 6410)
                                             Rodney Square, 1000 North King Street
                                             Wilmington, Delaware 19801
                                             Tel:    (302) 571-6600
                                             Fax:    (302) 571-1253

                                             -and-

                                             KLEE, TUCHIN, BOGDANOFF & STERN LLP
                                             Kenneth N. Klee (*pro hac vice*)
                                             Michael L. Tuchin (*pro hac vice*)
                                             David A. Fidler (*pro hac vice*)
                                             Whitman L. Holt (*pro hac vice*)
                                             Jonathan M. Weiss (*pro hac vice*)
                                             1999 Avenue of the Stars, 39th Floor
                                             Los Angeles, California 90067

                                             *Counsel to the Debtors and Debtors in Possession*